**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT E. ARGUE, III,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **DAVID DAVIS ENTERPRISES, INC.,** | : | |
| *trading as* **DAVIS ACURA,** | : | |
| **Defendant** | : | **NO. 02-9521** |

**M E M O R A N D U M   A N D   O R D E R**

PRATTER, J.                                                                    MARCH 20, 2009

Robert E. Argue, III sued his former employer, David Davis Enterprises, t/a Davis Acura ("Davis Acura"), David Davis, the owner, president and Chief Executive Officer of Davis Acura, and Joseph Daino, Davis Acura's general manager and sales manager. Mr. Argue invoked the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 955, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa. Cons. Stat. Ann. § 260.1 et seq. Specifically, Mr. Argue claimed that Davis Acura and the named defendants discriminated against him on the basis of his age when they terminated his employment in January 2001. The Court granted summary judgment in favor of Defendants on all but two claims, his ADEA and PHRA claims against Davis Acura.

On February 29, 2008, following an 8-day trial, the jury returned a verdict in favor of Mr. Argue, awarding him backpay in the amount of $107,000, car related expenses in the amount of $18,000, and health insurance premiums in the amount of $2,500. The jury did not find that Davis Acura had "willfully" discriminated against Mr. Argue, so no liquidated damages were awarded.

The parties filed a number of post-trial motions.  Davis Acura seeks (1) judgment as a matter of law, (2) a new trial, and/or (3) alteration of the judgment.  Mr. Argue asks the Court (1) to mold the judgment to compensate him for negative income tax consequences, (2) to mold the judgment to increase the lost wages component of the award, (3) to mold the judgment to include pre- and post-judgment interest, and (4) to recover attorney's fees and costs.  The Court resolves these motions as discussed below.

FACTUAL BACKGROUND[1]

In September 1998, Mr. Davis interviewed Mr. Argue for the position of service advisor at Davis Acura, a car dealership.  Mr. Davis offered, and Mr. Argue accepted, the position.  At this interview, Messrs. Davis and Argue did not discuss Mr. Argue's age.

Among other duties, the service advisor supported the service manager.  Before Mr. Argue interviewed for the service advisor position, Davis Acura had offered the service manager position to Mark Hartman, a 34-year-old.  Mr. Hartman declined the offer, and, before Mr. Argue started his new job as service advisor, Mr. Davis invited Mr. Argue to come for another interview, this time for the service manager position.

At this second interview, Mr. Davis did ask Mr. Argue about his age.  Mr. Argue replied that he was 52 years old.  Mr. Davis himself was 56 at the time.  According to Mr. Argue, Mr. Davis seemed surprised to find out that Mr. Argue was 52; Mr. Davis told Mr. Argue that he did not look his age, which was "good."  Mr. Davis offered Mr. Argue the position of service manager, and Mr. Argue accepted, understanding that his full job at Davis Acura would include

---

[1] The facts presented here reflect the evidence presented to the jury.  In many instances the facts were not disputed.  Where the parties presented differing accounts, those differences are noted.

the responsibilities of both the service advisor and service manager positions.

As service manager, Mr. Argue replaced Glen Davis, David Davis's son, who was 30 years old at the time.  From his hire date in September 1998 until November 2000, Mr. Argue's immediate supervisor was Mr. David Davis.  From November 2000 until his discharge in January 2001, Mr. Argue's immediate supervisor was Mr. Joseph Daino, General Manager of the dealership.

In October 2000, Mr. Daino and Randi Levin, Controller for Davis Acura, approached Mr. Davis about terminating Mr. Argue's employment.  On January 2, 2001, Mr. Daino, in the presence of Ms. Levin, fired Mr. Argue, citing poor performance and poor attitude as the reasons for the decision.  Davis Acura hired James Mann, a 34 year-old, to replace Mr. Argue.

On December 31, 2002, Mr. Argue commenced this suit.[2]

**TESTIMONY AT TRIAL[3]**

A.    *Mr. Robert Argue*

On direct examination, Mr. Argue testified that after accepting the offer to be service advisor at Davis Acura but before beginning work there, Mr. Davis called Mr. Argue and informed him that Mark Hartman, the person who was originally offered the job as service manager, had decided not to take the position.  2/20/08 Tr. at 40.  Mr. Davis and Mr. Argue then

---

[2] The procedural history of this case is fully recounted in the Court's November 24, 2004 and September 6, 2006 Orders (Docket Nos. 29, 45).  Part of the procedural history is considered in connection with the Court's evaluation of the fee petition.

[3] The Court does not recount the testimony of all of the witnesses here, only those relevant to Defendant Davis Acura's Motion for Judgment on the Pleadings.  To the extent the testimony of other witnesses is relevant to other motions, a summary of the relevant testimony is included in the specific discussion of the motion to which it relates.

had a meeting about the open service manager position, during which Mr. Davis asked Mr. Argue if Mr. Argue felt he could do that job.  2/20/08 Tr. at 41.  Both agreed that he could, despite Mr. Argue's lack of knowledge of handling paperwork concerning warranties and of financial statements.  Mr. Davis assured Mr. Argue that Mr. Argue would be trained in those areas.  *Id.*

Mr. Argue also testified that at that second interview, Mr. Davis asked Mr. Argue his age.  2/20/08 Tr. at 44-45.  When Mr. Argue responded that he was 52, Mr. Davis expressed surprise and said that Mr. Argue did not look or act his age, and that that was a "good" thing.  Id. at 45.  Mr. Davis went on to elaborate, saying that "men just get old, they get set in their ways, they can't do the job any more." Id. at 45.

Mr. Argue explained that when he started his job at Davis Acura, he took the position of service manager, but understood that he would have to temporarily serve as service advisor as well, until another employee could be hired for that position.  Id. at 47-48.

Mr. Argue testified that Mr. Davis had the final say in all personnel decisions, such as hiring and firing.  Id. at 52-53.  He also testified that Mr. Davis told him that before firing anyone, the employee in question should be given an opportunity to change and at least 2 corrective interviews.  Id. at 54.

Mr. Argue testified that other older employees had been either demoted or fired during his tenure at Davis Acura.  For instance, he testified that Mr. Blatnick went from shop foreman to technician, and that the new shop foreman was James Mann, who was in his early 30's.  Id. at 61-62.  (Mr. Mann was later to become Mr. Argue's replacement as service manager.)  Mr. Argue testified that Mr. Baltrush, who was parts manager when Mr. Argue started at Davis Acura, was demoted to assistant service and parts manager.  Id. at 61.  Mr. Argue told the jury that Mr. Davis

said that Mr. Baltrush had become "too old to do the job, that he was unable to manage any more, that he just couldn't get the job done." Id. at 64-65.  Mr. Argue also testified that Mr. Sabona, an older gentleman, was fired, but Mr. Argue acknowledged that Mr. Sabona had a number of performance deficits. Id. at 63-64.  According to Mr. Argue, Mr. Davis had commented that "he didn't believe that Mario [Sabona] could do his job, that he was – he was an old guy with a young wife and kids, and he felt that that was – between them and the job, it was too much for him." Id. at 64.

Mr. Argue recounted a number of other comments Mr. Davis made either in favor of youth or against age (or both).  Mr. Davis also talked about Mr. Mann's youth as an asset, and made "frequent" comments about managers getting old and set in their ways. Id. at 69-70.  Mr. Argue also testified about Mr. Davis's use of the term "prune brigaders" to describe older employees, usually retired individuals, who worked part time at the dealership delivering cars from one dealership to another. Id. at 72-73.  At one point in late 2000, after a misunderstanding regarding the hiring of "prune brigaders," Mr. Davis told Mr. Argue that he would consider Mr. Argue for a prune brigader job because Mr. Argue was old enough. Id. at 73, 79.  Mr. Argue also reported another comment of Mr. Davis's regarding Mr. Argue's age: after a customer problem arose, also in late 2000, Mr. Davis's first comment to Mr. Argue about the situation was, "Are you getting too old to do this job?" Id. at 79.  Mr. Argue also testified that Mr. Davis commented that Mr. Mann, the person 21 years Mr. Argue's junior who eventually replaced him as service manager, "would make a good replacement for [him] when the time came." Id. at 75.

As to his own performance, Mr. Argue testified that he felt that he got along well with his co-workers. Id. at 88.  He also noted that under his leadership the Davis Acura service

department earned the Acura home office distinction of "precision team" status in 1999 and received number 1 ratings while he worked in Davis Acura's service department.  Id. at 88-89. Mr. Argue testified that prior to being fired, no one approached him about any attitude problems or warned him about his job performance.  Id. at 101.

Mr. Argue described the circumstances surrounding his termination.  He recalled that Mr. Daino was the person who actually gave him the news that he was fired, but stated that Mr. Daino told him that Mr. Davis "wanted [him] to go."  Id. at 104.  Mr. Argue testified that Mr. Daino referred him to Acura's district management to make inquiry about jobs at other area Acura dealerships.  Id. at 104-05.

As to damages, Mr. Argue testified that in addition to lost wages, medical insurance, and emotional anguish, he also had to spend $10,000 on a car to replace the dealership demonstration car he drove while employed by Davis Acura.  Id. at 113-114.  He testified that he made efforts to find another similar job in the auto industry.  Id. at 116.  Not long after his termination from Davis Acura, Mr. Argue was hired by Ardmore Acura as a service advisor (at a salary lower than his salary at Davis Acura), and he held that position for about 6 months.  Id. at 117.  After that, he was unable to find another comparable job in the auto industry, so he got a commercial driver's license and had a series of jobs driving commercial vehicles.  2/20/08 Tr. at 117-125.

On the issue of falsified customer surveys,[4] Mr. Argue testified that Mr. Davis knew that the surveys were being falsified and actually directed Mr. Argue to do it.  2/21/08 Tr. at 42-44.

---

[4] Part of Davis Acura's defense at trial related to the claimed falsification by Mr. Argue of customer service surveys, which related to an after-acquired evidence theory by which Davis Acura was arguing that once the dealership found out about Mr. Argue having falsified customer survey responses (which it did soon after Mr. Argue was fired) he would have been discharged in any event.  Davis Acura did not mention this argument in its post-trial motions.

B.      *Mr. Davis*

David Davis was called as a witness in the Plaintiff's case-in-chief.  Mr. Davis confirmed that he asked Mr. Argue his age when he interviewed Mr. Argue for the service manager position.  2/21/08 Tr. at 188.  He testified that he did so because he wanted to know whether Mr. Argue was a "can-do [person] with energy."  Id. at 189.  Mr. Davis testified that Mr. Argue was most qualified to be a service advisor when he was hired, but that they were "going to develop" his service management skills.  2/22/08 Tr. at 50.  Mr. Davis also admitted that he was familiar with the term "prune brigaders" and that he had used the term.  Id. at 8.

At trial Mr. Davis cited competence issues as the "major issue" behind Mr. Argue's termination.  Id. at 16.  At his deposition, however, Mr. Davis had said that Mr. Argue would not have been terminated if it had not been for attitude problems.  Id. at 16-17.  The deposition testimony was used for impeachment purposes and for substantive evidence.  Mr. Davis testified at trial that there were "rumblings" regarding interpersonal problems between Mr. Argue and others, but that he never personally observed any such problems.  Id. at 4.

Mr. Davis admitted that as owner of the dealership, he had the power to hire and fire as he pleased.  Id. at 29-30.  He testified that he would have preferred it if Mr. Argue had been moved to a different position rather than fired, but that the ultimate decision was left to Mr. Daino.  Id. at 30.  Mr. Davis confirmed that he had not given Mr. Argue any warning that there were performance and/or attitude problems.  Id. at 31.  He testified that Mr. Daino and Ms. Levin came to him to discuss Mr. Argue before terminating Mr. Argue's employment.  Id. at 31-32.

Mr. Davis admitted that he was actively recruiting James Mann, Mr. Argue's eventual replacement, for Mr. Argue's position before Mr. Argue was terminated.  Id. at 33.  He testified

that Mr. Daino contacted Mr. Mann first, but that he (Mr. Davis) had between one and three conversations with Mr. Mann about the job before Mr. Argue was terminated.  Id. at 34-35.

Regarding the practice of manipulating customer service surveys, Mr. Davis testified that he found out that the practice was going on at his dealership from Mr. Daino after Mr. Argue was fired.  2/21/08 Tr. at 150.  His deposition testimony (which was used by Mr. Argue to reflect a prior inconsistent statement and/or admission as well as possibly to impeach Mr. Davis) reflected, however, that he discussed the practice with Mr. Argue, and possibly with Mr. Daino and Ms. Randi Levin, prior to Mr. Argue's termination.  Id. at 151-165.

C.   *Bernie Blatnick*

Mr. Bernie Blatnick, testifying for the defense, said that although he did work as shop foreman and was replaced as shop foreman by James Mann, he did not consider that change in title to be a demotion.  2/25/08 Tr. at 98-99.  He also testified that in 21 years of working with Mr. Davis, Mr. Davis never made any comments to him regarding his age, and that, in fact, he never heard Mr. Davis make any age-related comments at all.  Id. at 99-100.

D.   *Phyllis Levin*

Phyllis Levin, a cashier at Davis Acura, testified for the defense.  Ms. Levin worked nearby Mr. Argue for three months in 1998.  Id. at 125.  For six more months, she filled in for other cashiers nearby Mr. Argue at lunch time 3 or 4 times a week.  Id. at 124-25.  She testified that Mr. Argue asked her many times to explain to customers the work done on their cars, which she asserted was the responsibility of the service department, not of the cashiers.  Id. at 113-14.  She also testified that Mr. Argue occasionally was rude to her and to other cashiers, and that on one or two occasions he so upset a cashier that she cried.  Id. at 116-17.

Ms. Phyllis Levin testified that she never heard Mr. Davis make age-related comments to Mr. Argue, Mr. Baltrush, or Mr. Blatnick.  Id. at 121.

E.      *Gail Hoffman*

Gail Hoffman, a former Davis Acura employee, also took the stand for the defense.  Ms. Hoffman was a cashier at Davis Acura while Mr. Argue worked there.  Id. at 177.  She testified that Mr. Argue asked cashiers to explain things to customers, when it was his responsibility to explain them.  Id. at 177.  She frequently complained about this to Randy Levin.  Id. at 179.  She admitted that she could not remember Mr. Argue speaking harshly to cashiers.  Id. at 178.  She said that he did not speak to her in a rude or condescending manner.  Id. at 181.

Ms. Hoffman testified that she never heard Mr. Davis make any age-related comments. Id. at 184.

F.      *James Mann*

James Mann, who replaced Mr. Argue as service manager, was called by the defense.  He said that when he worked for Mr. Argue as shop foreman in 1999, Mr. Argue was a good manager who wanted "to do the right thing."  Id. at 192-93.  Mr. Mann said that when he worked with Mr. Argue, he never saw him "having a bad attitude" or mistreating co-workers.  Id. at 215.

Mr. Mann testified that Mr. Davis called him in late October or early November 2000 to discuss the possibility of returning to Davis Acura as service manager.  Id. at 195, 201-02.  Mr. Mann said that he went on to talk to Mr. Davis more than five times about the subject.  Id. at 202. After Mr. Davis called him, Mr. Daino also called Mr. Mann once to discuss the service manager job.  Id. at 196.

Mr. Mann testified that he never heard Mr. Davis make any age-related comments.  Id. at

194.

G.    *Debra Mattis*

Ms. Mattis, a current employee of Davis Acura, testified for the defense.  While Mr.

Argue was also employed there, she served as an office clerk and as a warranty clerk.  Id. at 233.

As warranty clerk, Ms. Mattis was supervised by Mr. Argue.  Id. at 235.  She testified that Mr.

Argue "wasn't any help" when she had warranty questions for him.  Id. at 235.  She stated that

Mr. Argue was condescending and rude to her.  Id. at 238.  She often complained about Mr.

Argue, and on more than one occasion she became very upset or cried as a result of having to

deal with him.  Id. at 240.  Ms. Mattis testified that she surreptitiously took a test about

warranties for Mr. Argue so that he would appear to have passed the test.  Id. at 241.

Ms. Mattis testified that the only age-related comments she ever heard Mr. Davis make

were comments about himself.  Id. at 245.  She also testified that she never spoke with Ms. Levin

about the customer survey manipulations.  2/26/08 Tr. at 39.

H.    *Randi Levin*

Ms. Randi Levin, Controller at Davis Acura, testified on behalf of the defense.  Ms. Levin

testified that she only heard Mr. Davis make one age-related comment and that it was about

himself.  Id. at 52.  She testified that she had problems with Mr. Argue's failure to close out

repair orders at the end of each month.  Id. at 56.  She stated that on one occasion, when she

approached Mr. Argue about closing out repair orders, she found him playing "Free Cell" on the

computer rather than working on the open orders.  Id. at 72.

Ms. Levin told the jury that Mr. Argue made some of the younger cashiers cry, and that

she had to talk to him about it.  Id. at 58-59.  She testified that "pretty much everybody on [her]

10

staff at one time or another. . . was not happy dealing with Mr. Argue." Id. at 59.  She stated that she did not have a personal conflict with him, however.  Id. at 97.  In late 2000, Ms. Levin made a list of complaints she had about Mr. Argue, including his failure to close out repair orders, playing solitaire on the computer, not answering phones, leaving the repair counter un-manned for long periods of time, and lack of knowledge of warranty claims. Id. at 74-78.  Ms. Levin testified that she provided Mr. Argue with the answers to an Acura service manager test regarding financial statements. Id. at 117.

I.      *Joseph Daino*

The defense also called current employee Joseph Daino.  Mr. Daino started as general sales manager at Davis Acura in October 1998 and became general manager in November 2000. Id. at 126.  Mr. Daino testified that he did not have any personal problems with Mr. Argue, but that he sometimes asked Mr. Argue to do something and Mr. Argue failed to follow through on the request. Id. at 128.  He also testified that Mr. Argue had the skills and knowledge to be service manager, id. at 164, that the main reason he fired Mr. Argue was not performance-related, and that performance issues were a very small part of the decision.  Id. at 171.

Mr. Daino testified that he received a variety of complaints about Mr. Argue from other Davis Acura employees through Ms. Randi Levin.  Id. at 129-32.  The complaints related to both attitude and job performance.  Id. at 128-133.

Mr. Daino recounted that in October or November of 2000, Mr. Davis called James Mann and that both he and Mr. Davis actively recruited Mr. Mann.  Id. at 133-34.  He testified that it was his decision to replace Mr. Argue.  Id. at 134-35.

Mr. Daino told the jury that he did not know about the customer service survey issues

11

until after Mr. Argue was terminated.  Id. at 138.  He testified that he did not discipline Ms.

Mattis or anyone else involved in the practice; rather he simply told them to stop and not do it

again.  Id. at 157-58.

J.    *John Maciejewski*

John Maciejewski testified in Mr. Argue's rebuttal case.  He worked at Davis Acura the

whole time Mr. Argue did.  Id. at 191.  Mr. Maciejewski observed Mr. Argue interacting with

cashiers and other office staff, and he never saw a problem.  He testified that Mr. Argue was not

rude or condescending, but, rather, was friendly.  Id. at 192.  After Mr. Argue was terminated, he

occasionally spoke with Ms. Levin, Ms. Mattis, Mr. Daino, and Mr. Davis about problems with

Mr. Argue's performance, including about Mr. Argue playing computer games.  Id. at 199-201.

During these discussions, Mr. Argue's attitude was not mentioned.  Id. at 199.

K.    *Robert Argue - Rebuttal*

Mr. Argue returned with rebuttal testimony.  He stated that Ms. Mattis did not come to

him with questions or problems very often, but if she did, he would help her or refer her to

someone who could help her.  Id. at 203.  Mr. Argue testified that he helped close repair orders as

much as he could and did not ignore Ms. Levin's requests for help.  Id. at 207.

## II.    Legal Standards and Discussion

A.    *Defendant's Motion for Judgment as a Matter of Law*

A motion for judgment as a matter of law "should be granted only if, viewing the

evidence in the light most favorable to the nonmovant and giving it the advantage of every fair

and reasonable inference, there is insufficient evidence from which a jury reasonably could find

liability."  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  "In

12

determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  Id. (citing Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190) (3d Cir. 1992), cert. denied, 507 U.S. 921 (1993)).  The Court may only enter judgment as a matter of law following return of a jury verdict "'if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001) (quoting Powell v. J.T. Posey Co., 766 F.2d 131, 133-4 (3d Cir. 1985)).

Under the ADEA, it is "unlawful for an employer. . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  In the Third Circuit, courts apply the McDonnell Douglas framework in analyzing ADEA claims like this one, based principally on circumstantial evidence.  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  Under that framework, a plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination by showing that he or she: 1) is over the age of 40; 2) is qualified for the position; 3) suffered an adverse employment decision; and 4) was replaced by a sufficiently younger person to create an inference of age discrimination.  Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998).

Once the plaintiff sets out a prima facie case, the defendant has the burden to produce evidence of a legitimate, non-discriminatory reason for the adverse employment decision.  Id. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the employer's reason was not the actual reason, but rather was a pretext for discrimination.  Id.

13

"[A]n employment discrimination plaintiff may survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a 'prima facie case,'. . .and second, evidence from which a rational factfinder could conclude that the employer's proffered explanation for its actions was false." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 154 (2000) (Ginsburg, J., concurring).

Davis Acura first argues that Mr. Argue failed to prove even a <u>prima</u> <u>facie</u> case of discrimination because he failed to prove that he was qualified for the position from which he was discharged.[5]  Defendant's Motion for Judgment as a Matter of Law or, in the Alternative for a New Trial and Motion to Alter or Amend the Verdict ("Def.'s Mot. for Judgment") at 56-59. Davis Acura points out that Mr. Argue himself testified that he had never held a management position prior to his job as service manager and that he lacked knowledge of factory warranties, financials and computers.

Mr. Argue counters that Davis Acura stipulated in its pre-trial memorandum and trial brief that he had set forth a <u>prima</u> <u>facie</u> case of age discrimination.  Pl.'s Opp. at 2-3.  He goes on to contend that even without such a stipulation, the record shows that Mr. Argue had substantial automotive and customer service experience, including 4 1/2 years of serving as a service advisor for another Acura dealership.  <u>Id.</u> at 4.  Mr. Argue adds, again, that while he was service manager at Davis Acura, the service department received from the national Acura office for the first time several number 1 rankings for service, as well as Acura's Precision Team Award.  <u>Id.</u> at 4-5.  He

---

[5] Davis Acura cites no case law regarding the qualifications prong of the <u>prima</u> <u>facie</u> case that directly supports its argument.  The one case that Davis Acura cites that does squarely address the issue involved a holding that the qualification prong was fulfilled.  <u>See</u> <u>Sempier v.</u> <u>Johnson & Higgins</u>, 45 F.3d 724 (3d Cir. 1995).

also points to Mr. Davis's deposition testimony, which he argues was confirmed at trial, that Mr. Argue was fired for attitude problems, not for any other reason, as evidence that Mr. Argue must then have been qualified objectively for his job.  See id. at 5.

Mr. Argue also cites to a Third Circuit Court of Appeals case that Davis Acura also cites, see n.5 supra, Sempier v. Johnson & Higgins, 45 F.3d 724 (3d Cir. 1995), to support his position. In Sempier, the court of appeals overturned the district court's holding that the plaintiff failed to raise a genuine issue of material fact as to whether he was qualified for the position from which he was terminated.  Id. at 729.  The court cautioned that "the prima facie case under the McDonnell Douglas-Burdine pretext framework is not intended to be onerous," and that a district court should not rely on subjective criticisms in determining whether a plaintiff has met the burden of setting forth a prima facie case.  Id. at 728-29.  As Davis Acura was quick to point out in its rebuttal, however, the plaintiff in Sempier had been employed at the defendant-company as an executive for 20 years, had served as comptroller and treasurer of the company, had been elected to the board of directors on two occasions, and had served as chief financial officer and chief administrative officer.  Id. at 729; see Def.'s Rep. at 4.

Whether or not a stipulation on this issue existed at the time of this trial (a fact which Davis Acura vigorously disputes, citing its Amended Pre-Trial Memorandum purporting to withdraw its initial stipulation as to the prima facie case), there was no genuine issue of material fact as to whether Mr. Argue proved that he was qualified for his job.  This Court implicitly held as much by instructing the jury that Mr. Argue had carried his burden as to the prima facie case. See 2/28/08 Tr. at 125.  While Davis Acura may decry the jury's verdict, it can not credibly argue that the jury had insufficient evidence to find that Mr. Argue was qualified for the job from

which he was discharged.  Indeed, the evidence included Mr. Davis's knowledge of Mr. Argue's credentials at the time he solicited Mr. Argue to accept the service manager position and was dismissive of Mr. Argue's concern about looking for additional on-the-job training.

Moreover, issues regarding whether Mr. Argue failed to complete or even learn tasks assigned to him are better suited for analysis of the employer's alleged legitimate, nondiscriminatory reason for firing instead of consideration in the context of the hiring qualifications.  Courts in this circuit have often rejected qualification arguments altogether in cases involving job termination, as opposed to cases involving failure to hire or failure to promote claims.  See, e.g., Sempier, 74 F.3d at 729; Weldon v. Kraft, Inc., 896 F.2d 793, 798-99 (3d Cir. 1990); Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989); Harding v. CareerBuilder, LLC, No. Civ. A. 04-0188, 2005 WL 396576, at *5 (E.D. Pa. Feb. 18, 2005).  This Court has previously rejected arguments that poor performance, even coupled with evidence that the plaintiff had never performed the specific tasks required in previous jobs, is enough to demonstrate a lack of qualifications in a termination case.  See, e.g., Brisker v. Potter, Civil Action No. 06-4473, 2007 WL 4225571, at *5 (E.D. Pa. Nov. 29, 2007) (holding that plaintiff who had 10 years of U.S. Postal Service experience was qualified for another position within the postal service, despite the fact that the plaintiff had no prior experience doing some of the specific tasks required in the new position).  One court in this circuit has even equated being hired for a position with being qualified for it.  See Massaro v. The Chester Hous. Auth., No. Civ. A. 98-245, 1999 WL 624485, at *2 (E.D. Pa. Aug. 5, 1999) ("Having been hired for the position at issue. . ., [plaintiff] has shown that he was qualified for the position thereby meeting the second prong.").

Here, it is undisputed that Mr. Argue had many years of experience in the automotive industry, as well as four years of experience as a service advisor in a car dealership.  Likewise, the parties do not dispute that Mr. Argue ultimately had a 2-1/2-year tenure with Davis Acura or that, having solicited Mr. Argue for the specific position, Mr. Davis knew about Mr. Argue's prior experience, and lack thereof, when he hired Mr. Argue.  Obviously, Davis Acura could not dispute that Mr. Davis hired Mr. Argue in the first place.  Thus, lack of qualification for the job in the first instance is simply not a viable issue, and Davis Acura's contentions regarding Mr. Argue's failure or refusal to learn (and other performance issues) logically fit in the discussions of legitimate, nondiscriminatory reasons and pretext, rather than in the discussion of the prima facie case.

Next, Davis Acura contends that Mr. Argue failed to prove that its proffered reason for termination was merely a pretext for discrimination.[6]  Davis Acura asserts that the only evidence offered by Mr. Argue to support age discrimination was his own testimony.  Def.'s Mot. for Judgment at 61.  Davis Acura claims that no reasonable jury could have concluded that Davis Acura's proffered reasons for termination, namely, poor performance and poor attitude, were false, given that Mr. Argue himself testified that he did not always close repair orders by the end of the month and relied on Randi Levin's help, that he relied on the warranty clerk because he lacked familiarity with factory warranties, that he played computer games during working hours, that he may have spoken "loudly" to cashiers, and that he needed help from others to take service manager tests.  Def.'s Mot. for Judgment at 64.

_____

[6] Mr. Argue does not dispute that Davis Acura expressed, or at least stated, a legitimate, nondiscriminatory reason for his discharge.  See Pl.'s Opp. at 9.

17

Davis Acura disputes that there was any evidence presented of past discriminatory treatment of Mr. Argue or anyone similarly situated.  Id. at 66.  It also notes that even if the jury did not believe that Mr. Argue performed poorly or had a bad attitude, Mr. Argue failed to show that the decision-makers at Davis Acura did not nonetheless believe that he performed poorly and had a bad attitude and fired him for those reasons.  See id. at 70, citing Watson v. Southeastern Pennsylvania Transp. Auth., 207 F.3d 207 (3d Cir. 2000).  Davis Acura also points to the fact that Mr. Argue was in the protected age group both at the time of his hiring and his firing and argues that it thus was unreasonable to ascribe to Davis Acura a discriminatory motive.  Davis Acura's argument here is tantamount to arguing that as long as Davis Acura hired someone in their early 50's, then Davis Acura should be somehow forever immunized from accusations of age discrimination as to its treatment of that person.

Davis Acura also claims that Mr. Daino and Ms. Randi Levin were the actual decision-makers in this case, and that Mr. Argue presented no evidence of any age-related motives on their part.  It asserts, and rightly so, that a plaintiff's mere subjective beliefs alone are not enough to demonstrate pretext.  Davis Acura also contends that an employer has no duty to warn an employee before termination and that therefore Mr. Argue's evidence regarding the lack of warning of performance or attitude problems is irrelevant.

As to Mr. Argue's testimony regarding similarly situated employees who were subject to age discrimination, Davis Acura asserts that Mr. Argue admitted that his examples were based on personal speculation, not on any involvement in the decision-making process.  Mr. Baltrush, Davis Acura claims, was not demoted when a younger hire replaced him as parts manager.  Likewise, Mr. Blatnick, who was replaced as shop foreman by the young Mr. Mann (who was

hired in part by Mr. Argue and later replaced Mr. Argue as service manager), was still in the

employ of Davis Acura by the time of trial, and Davis Acura claims that even if Mr. Davis told

Mr. Argue that Mr. Blatnick "couldn't get the job done anymore," it had nothing to do with age.

Finally, as to Mario Sabona, Mr. Argue himself testified that Mr. Sabona deserved to be fired, so

Mr. Davis's alleged comment that Mr. Sabona was "an old guy with a young wife and kids"

made no difference, even if it was true.

Finally, Davis Acura asserts that the age-related comments that Mr. Argue attributed to

Mr. Davis were unsupported by other evidence and unconnected to the decision to terminate Mr.

Argue.  Thus, Davis Acura cites several cases that hold that one comment, particularly one

remote in time from termination or not related to the decision-making process, is not enough to

prove that age was a factor in termination, even if the comment was made by a decision-maker.

See, e.g., Joseph v. First Judicial Dist., No. CIV. A. 97-6730, 1999 WL 79056 (E.D. Pa. Feb. 2,

1999); Fletcher v. Lucent Techs. Inc., 207 Fed. Appx. 135 (3d Cir. 2006); Keller v. Orix Credit

Alliance, Inc., 130 F.3d 1101, 1113 (3d Cir. 1996); Armbruster v. Unisys Corp., 32 F.3d 768,

779 (3d Cir. 1994).

Mr. Argue, on the other hand, asserts that he did everything he needed to do to prove his

case, namely, he produced evidence "'from which a factfinder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of the

employer's action.'"  Pl.'s Opp. at 9, quoting Keller, 130 F.3d at 1108.  Mr. Argue cites

numerous portions of his own trial testimony which he claims led to an inference of

discrimination, including his own testimony of his good job performance, a pattern of

19

replacement of older employees for younger ones, Mr. Davis's "numerous age-biased comments and biased attitude," and Mr. Davis's referral of him to another Acura dealership for possible employment.  He also points to the testimony of Messrs. Maciejewski and Mann that he was a good manager and that he interacted well with others.

Mr. Argue sets forth as evidence in his favor Mr. Davis's testimony that he (Mr. Davis) asked employees their ages, that Mr. Davis admitted his belief that age is indicative of certain traits, and that he recruited Mr. Mann for Mr. Argue's position before Mr. Argue was fired and without warning Mr. Argue.  Mr. Argue asserts that although Mr. Davis testified that he did not want Mr. Argue to be fired, and that he would have preferred that he be retained in another position, Mr. Davis's actions in not transferring Mr. Argue work at the other, larger Davis dealership belie those self-serving statements.

Mr. Argue also contends that the arguably legitimate, nondiscriminatory reasons Mr. Davis and Mr. Daino said they had for terminating him are riddled with contradictions.  He asserts that both supervisors undermined their testimony that performance issues were at the heart of his termination by confirming deposition testimony in which they separately stated that Mr. Argue would not have been terminated if it had not been for his bad attitude.  Thus, he explains that all of the performance problems discussed by Davis Acura's witnesses at trial are irrelevant because Mr. Davis and Mr. Daino admitted pre-trial that Mr. Argue was not terminated for poor performance.

Mr. Argue attacks the "poor attitude" reason by contending that Mr. Davis undercut that reasoning by testifying at one time that the "attitude" issues had to do with an inability to work well with certain female support staff and at another time that those issues were primarily

directed towards other managers.  Mr. Argue also points to Gail Hoffman's testimony that she

worked as a cashier and was stationed near Mr. Argue and the other cashiers and yet did not

remember Mr. Argue speaking harshly or being rude or condescending.  Mr. Argue notes that the

witnesses who testified to his "poor attitude" were interested parties or otherwise had the

motivation to tout the defense theory–all were employed by Davis Acura–and the people to

whom Mr. Argue allegedly acted rudely, the young cashiers, did not testify at all.[7]

Mr. Argue also submits as evidence of age discrimination that three witnesses testified to

the fact that Mr. Mann, who is 21 years younger than Mr. Argue, was being recruited to replace

him at least two months before Mr. Argue was actually terminated.  He cites Waldron v. SL

Indus., Inc., 56 F.3d 491, 496 n.6 (3d Cir. 1995), to counter Davis Acura's argument that the fact

that he was in the protected age group both at the time of his hiring and at the time of his firing

creates an inference against discrimination.  In Waldron, the Third Circuit Court of Appeals held

that the fact that an employee was  hired at age 61 and fired at age 63 did not create a "strong

inference" of age discrimination, but rather was merely evidence to be weighed like any other

evidence, expressly rejecting the approach of courts in other circuits.  Mr. Argue further

contends, again citing Waldron, that it is plausible that an employer may hire an older employee

to make use of his skills until a younger replacement receives enough training to take over the

job.  See Pl.'s Opp. at 24.  He analogizes that situation to his case by proposing that Mr. Davis

may have hired Mr. Argue as a mere "placeholder" because he needed to fill the service manager

position quickly after Mr. Hartman turned down the job, and then replaced Mr. Argue once a

---

[7] Of course, the young cashiers were equally available to both sides in this litigation and could have been called to be witnesses by either.  In any case, no party made any arguments based on the non-appearance of the cashiers, and none will be entertained here.

younger service manager became available.  He bolsters this argument by citing his own trial testimony that Mr. Davis told him that Jim Mann would be a good replacement for him when he was "ready to go."  See id., citing 2/20/08 Tr. at 75.   Mr. Argue draws further parallels to Waldron by noting that the Waldron plaintiff was fired by a supervisor who first sought approval from a company president who had made an age-biased comment to the plaintiff five months earlier, and that the court found this comment to be significant in that it was made by the person who ultimately approved the decision to fire the plaintiff.  See Pl.'s Opp. at 26.

Mr. Argue contends that the lack of any warning to him about his supposedly poor performance or poor attitude, while not in and of itself determinative, bolsters his discrimination claim.  He also asserts that his testimony about older managers being replaced by younger workers was not based merely on subjective beliefs but on what he witnessed actually occurring at Davis Acura, and that, regardless of Davis Acura's explanations, the jury still was entitled to take Mr. Argue's testimony into account and weigh it against those defense explanations.

In its reply effort to undermine the verdict, Davis Acura likens Mr. Argue's case to Hicks v. The Tech Indus., 512 F. Supp. 2d 338 (W.D. Pa. 2007).  In Hicks, Davis Acura argues, neither plaintiff's own subjective beliefs nor age-related comments unrelated to the plaintiff or his job performance were enough evidence to enable the plaintiff to withstand summary judgment.  See Def.'s Rep. at 5-8.  Davis Acura calls Hicks "strikingly similar" to the case at hand.  Id. at 5.  Mr. Argue, in his sur-reply, takes issue with this comparison, pointing out that in Hicks, the plaintiff failed to even establish a prima facie case of discrimination, cited no negative, age-related comments regarding himself, and failed to rebut his long record of absenteeism.  See Pl.'s Sur. at 6-7.

22

As is true with most cases subjected to post-trial motion practice, Mr. Argue's case at trial was neither as weak as Davis Acura makes it out to be, nor as strong as Mr. Argue contends it was. Viewing the trial evidence in the light most favorable to Mr. Argue, however, the Court cannot say that the record is "critically deficient of the minimum quantity of evidence from which a jury might reasonably afford relief." See Trabal, 269 F.3d at 249 (internal quotations omitted). Indeed, to accept Davis Acura's arguments would require the Court to accept only the defense interpretation of the trial evidence and conclude that the jury should have rejected all of Mr. Argue's submissions and arguments. There is no legitimate reason to do so.

Davis Acura accurately describes the Supreme Court's Reeves decision as stating that a plaintiff who proves a prima facie case and presents evidence of pretext is not guaranteed to survive judgment as a matter of law if, for instance, "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." See Reeves, 530 U.S. at 148. However, such is not the case here. The record of the evidence presented to the Argue jury did not conclusively reveal a nondiscriminatory reason for termination, and there certainly was not "abundant and uncontroverted independent evidence that no discrimination occurred."

First, despite Davis Acura's vigorous contentions otherwise, Mr. Argue's own testimony was not the only evidence of discrimination in this case. While the defense belittles Mr. Argue's testimony, it should not be entirely disregarded simply because it comes from an interested party. The jury was entitled–indeed, it was obligated–to listen to his testimony and draw its own conclusions as to Mr. Argue's credibility. Just as Mr. Argue was clearly interested in the

23

outcome of the case, the same can be said for Mr. Davis and the employees of Davis Acura who testified at the trial.  Although no other Davis Acura employees corroborated any age-biased comments made by Mr. Davis, Mr. Davis <u>himself</u> corroborated at least some of Mr. Argue's testimony regarding specific age-related comments by Mr. Davis.  Mr. Davis admitted that he asked Mr. Argue his age when he interviewed him for the service manager position.  Mr. Davis's own testimony also could be interpreted as evidence that he equated age with energy level, demonstrating a bias against older workers.  Mr. Davis admitted that he could have made comments that Davis Acura "needed people with energy," or that he wanted to "get rid of old ideas or old ways of thinking."  Mr. Davis also admitted that he was familiar with, and even used, the term "prune brigaders."  Davis Acura attempts to diffuse this "prune brigade" admission by pointing out that while Mr. Argue admitted that he perceived that term as offensive, perhaps others would not find it so.  The Court does not question that that possibility exists, but rather observes that if Mr. Argue perceived the term as offensive, it is equally plausible that the jury quite easily may have seen it in the same light as Mr. Argue.  At the very least, it would be fair to say that Mr. Davis's undeniable trial testimony about his company's "prune brigade" was heard by the jury and was memorable.

Second, Davis Acura tries to escape the significance of Mr. Davis's comments by arguing that Mr. Davis was not the decision maker in this case.  Of course, Davis Acura's counsel was energetic in making that argument to the jury, but the jury was not obliged to adopt the defense interpretation.  Indeed, Mr. Argue presented sufficient evidence for the jury to link Mr. Davis to the termination decision:  Mr. Davis was the hands-on owner of the dealership; Mr. Davis, Mr. Daino, and Ms. Randi Levin all testified that the three of them met to discuss whether Mr. Argue

24

should be terminated; Mr. Davis testified that he had the ultimate authority to hire and fire

employees at his dealership and could have prevented Mr. Argue's termination; Mr. Davis, Mr.

Daino, and Mr. Mann all testified that Mr. Davis played a role in recruiting Mr. Mann as Mr.

Argue's replacement in the months before Mr. Argue was terminated.  Coupled with Mr. Argue's

testimony that Mr. Daino told him that Mr. Davis wanted Mr. Argue to go and that Mr. Davis

had previously had the last word in hiring and firing as to personnel decisions with which Mr.

Argue was involved, the jury easily could have inferred that Mr. Davis's role in the decision to

fire Mr. Argue was significant enough that any age bias on Mr. Davis's part (or his subordinates'

understanding of their boss's views) influenced the decision.  See Roebuck v. Drexel Univ., 852

F.2d 715, 733 (3d Cir. 1988) (holding that university president's negative racial comments,

despite being made five years before the denial of tenure of which plaintiff complained, were

probative in part because of the president's "significant influence on the attitudes and procedures

of the tenure decisionmakers").

  Davis Acura overlooks that the jury was the ultimate fact finder in this case.  Davis

Acura continues to approach the task at hand as if this were a summary judgment motion instead

of a post-jury verdict effort.  Davis Acura cites a number of cases that hold either that one

discriminatory comment does not a successful discrimination claim make, or that a comment

sufficiently removed in time from the termination or not inexorably related to the decision-

making process cannot sustain a discrimination claim.  These cases are easily distinguishable

from the situation here.  To the extent those cases involve only one stray age-related comment,

the jury here heard testimony about several age-related comments, including comments

specifically directed at Mr. Argue, some of which Mr. Davis himself corroborated.  Compare

Fletcher, 207 Fed. Appx. at 138 (holding that stray and ambiguous remark was not enough to prove discrimination); Joseph, 1999 WL 79056 (holding that single ambiguous remark did not establish pretext).  To the extent that the cases Davis Acura enlists involved stray remarks unrelated to the decision-making process, Mr. Argue alleged and told the jury about a pattern of age-related comments, beginning before he was even hired formally for his position and continuing throughout his tenure at Davis Acura.  Compare Keller, 130 F.3d at 1112-13 (holding that one stray comment four or five months before decision to terminate plaintiff was not enough to prove age discrimination); Armbruster, 32 F.3d 768 (holding that a stray remark made by someone who resigned 3 months before the allegedly discriminatory transfers were made was not direct evidence of discrimination, but disagreeing with the district court's assessment that other age-related comments were not probative of discrimination, even if not direct evidence).[8]

Equally unavailing are Davis Acura's arguments that there could be no discrimination when Mr. Davis and Mr. Argue were both in the protected class and Mr. Argue was both hired and fired while in the protected age class.  Davis Acura cites Massaro, 1999 WL 624485, which it construes as "holding plaintiff failed to establish age discrimination was a factor in his termination 'since Plaintiff was age 59 at the time of hiring, it is difficult to argue that he was terminated, at age 59 as a result of his age.'"  See Def.'s Mot. for Judgment at 71.  Massaro,

---

[8] Davis Acura also cites Justice O'Connor's concurrence in Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989), as support for its argument that statements unrelated to the decision-making process are not sufficient to prove discrimination.  Reliance on this passage from Hopkins is misplaced.  In Hopkins, Justice O'Connor was discussing what evidence is sufficient to set forth a direct evidence discrimination case, not a circumstantial case like the one here.  Indeed, Davis Acura's citation demonstrates that even stray discriminatory remarks can be probative.  See Def.'s Mot. for Judgment at 81 (quoting Hopkins: "'Stray remarks in the workplace, while perhaps probative of [a discriminatory animus]. . .'") (emphasis added).

however, turns not on the fact that the plaintiff was in the protected group at the time of both

hiring and firing, but rather on the failure of the plaintiff to prove the fourth prong of the prima

facie case or to provide any direct evidence of discrimination.  Massaro, 1999 WL 624485, at *2.

As discussed above, the Third Circuit Court of Appeals has held that the fact that an employee

was both hired and fired while in the protected class does not create a "strong inference" of age

discrimination; the case does not stand for the proposition that such a fact pattern never allows

for a finding of discrimination.  See Waldron, 56 F.3d at 496 n.6.

     Davis Acura also tries to invoke this Court's decision in Rizzo v. PPL Serv. Corp., Nos.

Civ. A. 03-5779, 03-5780, 03-5781, 2005 WL 913091 (E.D. Pa. Apr. 19, 2005).  Davis Acura

suggests that in Rizzo, this Court found that "plaintiff did not produce evidence that age was a

factor in termination where 'relevant decision makers were themselves in the protected age

group.'"  See Def.'s Mot. for Judgment at 71.  What Davis Acura ignores, however, are the

numerous other factors that counseled against a finding of discrimination in Rizzo: that the

plaintiffs had been terminated pursuant to an investigation of sexually inappropriate emails, that

the people involved in investigating the emails did not even know the ages of the employees they

investigated, that the plaintiffs presented no evidence of age-related comments or other

background facts that could support an inference of discrimination, and that 25 other employees

linked to the investigation who were of the same age or older received lesser or no discipline.

See Rizzo, 2005 WL 913091, at *11.  See also Ziegler v. Delaware County Daily Times, 128 F.

Supp. 2d 790 (E.D. Pa. 2001) (stating in a footnote that the "inference of discrimination is . . .

less since the decision maker was a member of the same protected class as the plaintiff," but not

that the inference of discrimination is wholly negated by that fact).

Third, Mr. Argue presented evidence that other members of the protected age class at Davis Acura were either demoted or terminated.  Mr. Argue testified that Mr. Baltrush was demoted from the position of parts manager and replaced by a younger employee.  Although Davis Acura attempted to discredit the significance of this fact by introducing testimony that Mr. Davis did not consider Mr. Baltrush's change in title a demotion, the fact remains that Mr. Baltrush served as parts manager and changed jobs from parts manager to <u>assistant</u> to the parts and service managers when Mr. Maciejewski became parts manager.  Whether such a change constituted a "demotion" or evidence supporting age-biased attitudes or not was within the province of the jury to determine.

Mr. Argue also testified that Mr. Blatnick, in his 50's, was replaced by Mr. Mann, in his 30's, as shop manager and demoted to the position of technician and NS expert.  Plaintiff was involved in the hiring of Mr. Mann, but testified that Mr. Davis made the final decision to hire him.  Mr. Blatnick testified that he was working as shop foreman but also worked as a technician during that time as well; he testified that he did not see his change in position to be a demotion because he continued to function as a technician (i.e., perform the same job functions) after Mr. Mann was hired.  Again, however, despite testimony that Mr. Blatnick did not see losing the title of shop foreman as a demotion, the jury, like Mr. Argue, was free to weigh the fact that Mr. Blatnick was once shop foreman and was replaced in that position by a younger employee against his testimony about his perceptions of that transition.[9]

Finally, while this Court agrees with Davis Acura's proposition that a plaintiff's

---

[9] Mr. Argue also testified that when Mr. Sabona was fired, Mr. Davis made comments about Mr. Sabona being an old man with a young wife who was "unable to keep up."  Mr. Argue himself stated that Mr. Sabona was fired for attendance issues, however.

subjective beliefs about the plaintiff's own job performance do not prove pretext, the jury did not have only Mr. Argue's self-evaluation about his job performance to justify rejecting Davis Acura's proffered reasons for termination.  Mr. Argue's testimony was coupled with evidence from other witnesses.  First, although Davis Acura's failure to warn Mr. Argue of performance problems is not in and of itself determinative of the issue, it is a piece of evidence that the jury could weigh along with other evidence, including evidence that Davis Acura had warned other employees of performance issues prior to termination, but did not do so with Mr. Argue.  See Sempier, 45 F.3d at 731 (holding that plaintiff's assertions of good performance, together with a lack of unfavorable criticism, could allow a jury to infer than an employer's post hoc issues with the plaintiff's performance are suspect).  Mr. Argue testified, without contradiction, that others were warned of performance problems, thus distinguishing this case from those cited by Davis Acura in which the plaintiffs simply complained of not being warned of performance criticisms where there was no policy of warning employees before termination.  See, e.g., Healy v. NY Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir. 1988) (noting that companies have no obligation to warn employees of performance issues); Rand v. CF Indus., Inc., 42 F.3d 1139, 1145 (7th Cir. 1994) (noting that no warning was required when employer had no policy obligating a warning).

Inconsistencies among witnesses arose regarding Mr. Argue's performance and attitude. Some witnesses testified that Mr. Argue performed poorly (e.g., Ms. R. Levin, Mr. Daino), while others testified that he was a good manager (e.g., Mr. Mann, Mr. Maciejewski).  Mr. Daino, who testified that he ultimately made the decision to fire Mr. Argue, also testified that the main reason he fired him was not performance-related.  Likewise, as to Mr. Argue's attitude, current employees of Davis Acura testified that Mr. Argue had interpersonal problems with co-workers,

but former employees testified that they saw no evidence of such behavior–indeed, Ms. Hoffman,

a former Davis Acura cashier, testified that Mr. Argue was never rude or condescending to her,

nor could she remember him speaking rudely to other cashiers.

Mr. Argue's case was indeed a hotly contested one, pre-trial, during the trial, and in this

post-trial phase as well.  At trial, the antipathy between and among counsel and the litigants was

at times palpable–often detracting from the presentation of evidence and certainly distracting for

both the jury and the Court.  Thinly veiled expressions of real or feigned exasperation, sarcasm,

and the like occurred during the trial with a disappointing frequency.  On the merits, the case

could even be described as a close one.  Nevertheless, the record reveals at least sufficient

evidence from which the jury could have reasonably found in Mr. Argue's favor to the extent it

did.  Therefore, Davis Acura's Motion for Judgment as a Matter of Law is denied.

   B.   *Motion for a New Trial*

Davis Acura also moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a).

Under that Rule, the district court may order a new trial "for any reason for which new trials have

heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P.

59(a).  According to the Supreme Court, a motion for a new trial may be "bottomed on the claim

that the verdict is against the weight of the evidence ... or that, for other reasons, the trial was not

fair to the party moving; and [it] may raise questions of law arising out of alleged substantial

errors in admission or rejection of evidence or instructions to the jury." Montgomery Ward & Co.

v. Duncan, 311 U.S. 243, 251 (1940); see also Wright & Miller, Federal Practice and Procedure §

2805 (1995) (enumerating several grounds for a new trial).

The trial court undertakes a two-step inquiry in order to decide a Rule 59 motion. First,

the Court determines whether there was error.  Second, the Court looks to Rule 61 of the Federal Rules of Civil Procedure and decides whether any error was so prejudicial as to be "inconsistent with substantial justice."  Alicea v. Ralston, Civil Action No. 03-3698, 2006 WL 2945250, at *1 (E.D. Pa. Oct. 13, 2006) (citing Goodman v. Pa. Turnpike Comm'n, 293 F.3d 655, 676 (3d Cir. 2002); Farra v. Stanley-Bostitch, Inc., 838 F. Supp. 1021, 1026 (E.D. Pa. 1993)).  "The burden to show harmful error rests on the movant."  Id. (citing Wright & Miller § 2803, at 47.).

When a motion for a new trial is based on an alleged error involving a matter within the sound discretion of the trial court, such as the court's evidentiary rulings or points of charge to the jury, the trial court has wide discretion in ruling on the motion.  Griffiths v. CIGNA Corp., 857 F. Supp. 399, 410 (E.D. Pa. 1994). However, a trial court has only limited discretion in ruling on a motion for a new trial based on the argument that the verdict is against the weight of the evidence.  Mullins v. City of Philadelphia, 2007 WL 712418, at *2 (E.D. Pa. Mar. 6, 2007) (citing Greenleaf v. Garlock, Inc., 174 F.3d 352, 366 (3d Cir. 1999)).  Although the standard for the grant of a new trial is lower than that for judgment as a matter of law, "a new trial should not be granted unless 'the record shows that the jury's verdict resulted in a miscarriage of justice' or 'the verdict, on the record, cries out to be overturned or shocks our conscience.'"  See Moussa v. Commonwealth of Pa., 289 F. Supp. 2d 639, 662 (W.D. Pa. 2003) (quoting Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)).

Davis Acura argues that it is entitled to a new trial for two reasons: (1) because the verdict is against the weight of the evidence, and (2) because Mr. Argue's counsel made improper and prejudicial statements on cross-examination and in closing arguments.  As to its first reason, Davis Acura asserts essentially the same arguments it set forth in arguing for

31

judgment as a matter of law–that Mr. Argue failed to prove pretext or to set forth any evidence of intentional age discrimination.  Again, the Court observes that Mr. Argue's case was not rock solid or overwhelming.  However, the Court can not and will not grant a new trial simply because others might have weighed the evidence differently, reacted to witnesses differently, or reached a different factual conclusion.  See Valentin v. Crozier-Chester Medical Center, 986 F. Supp. 292, 298 (E.D. Pa. 1997).  This Court has already found that Mr. Argue set forth enough evidence for a reasonable jury to conclude that his termination was due to age discrimination for which he was entitled to some money damages.  This verdict neither shocks the conscience nor cries out to be overturned.  Thus, Davis Acura's first argument for a new trial fails.

Davis Acura also contends that Mr. Argue's counsel's closing argument contained so many improper and inflammatory comments that, when taken as a whole, it is reasonably probable that the jury was misled and confused by counsel's "misconduct."  See Forrest v. Beloit Corp., 424 F.3d 344, 351 (3d Cir. 2005).  The supposedly improper remarks cited by Davis Acura generally fall into four groups.

The first consists of comments that the defense complains cast doubt on the honesty of Davis Acura's witnesses and counsel:

> Do you remember the notes [Mr. Davis] said he was given by counsel shortly before he testified, to help him prepare to testify?  Do you remember the group meeting before the first testimony under oath in this case?  And I ask you, what rational purpose is there for a group meeting of witnesses, but for the purpose of coordinating testimony among different parties or different people.

2/28/08 Tr. at 99.

> Do you remember the manner in which Mr. Davis was questioned by his counsel, who because I called Mr. Davis first, is allowed to cross-examine her own client.  Do you

32

remember the virtual putting words in his mouth, the leading questions literally, literally telling him basically what the answers should be?

Id. at 99-100.

[T]hat tells you what we're dealing with here.  We're dealing with people who meet in groups to prepare testimony.  We're dealing about a gentleman who receives notes to help prepare his testimony.  We're dealing with. . . bold-faced, I have to put it politely, but intentional misrepresentation to you in the testimony.[10]

Id. at 105.

The second general category includes a comment by Mr. Argue's counsel that Davis Acura asserts made improper use of summary judgment affidavits by not explaining to the jury that the affidavits were for limited purposes and not intended to include all potential testimony:

[As to the affidavits of Ms. Randi Levin and Ms. Mattis filed with Davis Acura's summary judgment motion], look at the overwhelming difference between what was said before under oath and what was said here in court. . .

Id. at 100.

The third category of comments relate to Mr. Argue's counsel "attempt[ing] to inflame the jury and garner the jury's sympathy for plaintiff by arguing that Davis Acura submitted the evidence regarding the manipulation of customer surveys in order to make plaintiff appear to be a 'terrible' and 'dishonest' person."  Def.'s Mot. for Judgment at 87.

[After-acquired evidence defense] makes my client look like a terrible person.  And of course insulates Mr. Davis and makes him not look like a terrible person.  And by terrible, I mean someone who would actually defraud and be dishonest.

---

[10] The ellipsis in this quotation marks where Davis Acura's counsel made an objection. She did not make an additional objection at the end of the quotation.

33

2/28/08 Tr. at 102.

But most importantly, the purpose of the defendant introducing this defense is to make Mr. Davis look honest and truthful and to make my client look like a liar.

Id. at 103.

This defense and the reason it's being presented to make Mr. Argue look like a bad guy, the dishonest guy, well, it reflects right back on the defendant.

Id. at 104.

The final category of comments include those that are allegedly related to evidence not of record. Davis Acura claims that Mr. Argue's counsel impermissibly referred to testimony not in evidence regarding the manipulation of customer service surveys, specifically:

You will see the documents, we call them COP, C-O-P documents. You see the C-O-P documents in this case. Over a two and third [sic] year period, you'll count them, there's 51 of them. Do the math, 51 out of approximately 20 repair orders a day, was it a conservative estimate by Mr. Argue, which I believe Mr. Daino agreed to. I did the math on the way down here and it came to approximately a total just – I just did it over two years, was 14,400 total repair orders. That's very conservative over two years. 51 out of 14,400 and I'm not even counting the three months in 1998.

Id. at 102.

At trial, Davis Acura objected directly to the comments in the first category (or at least parts of them), but did not specifically object at trial to any of the comments in the other three categories. After Davis Acura's first objection to the comments made by Plaintiff's counsel regarding group meetings of defense witnesses, the Court did not sustain the objection but instructed Plaintiff's counsel to move on. See id. at 99. After Davis Acura's second objection to Mr. Argue's counsel's comment regarding defense counsel leading Mr. Davis, the Court noted

34

that any such "questioning was acted upon if objections were raised, so you can continue on. I'm sure the jury will recall the progress of trial." See id. at 100. As to Davis Acura's objection to Mr. Argue's counsel's later comments regarding defense witnesses meeting in groups and using notes to prepare testimony, the Court overruled the objection. See id. at 105.[11]

Davis Acura compares this case to other cases in the Third Circuit in which new trials have been granted for reasons relating to closing arguments. In particular, it cites Draper v. Airco, Inc., 580 F.2d 91 (3d Cir. 1978), and Fineman v. Armstrong World Indus., 980 F.2d 171 (3d Cir. 1992). In Draper, the Third Circuit Court of Appeals reversed the district court's denial of a new trial because of numerous improprieties in counsel's closing remarks. Defense counsel in that case objected to the remarks at the end of closing arguments, requested curative instructions, and filed motions asking for a special instruction or mistrial. Id. at 94 n.2. The offending closing argument included repeated references to the wealth of defendants, assertions of defense counsel's personal opinions on the justness of his client's cause, references to facts not in evidence, and a variety of insulting and prejudicial comments about opposing counsel, including allegations that the attorneys were part of a conspiracy with their clients and that they deliberately withheld documents. Id. at 95. Looking at the offensive statements as a whole, the court of appeals granted defendants a new trial. Id. at 97.

The appeals court in Fineman upheld the grant of a new trial because of plaintiff's counsel's improper conduct during closing arguments. Fineman, 980 F.2d at 106. In that case, defense counsel had filed a motion in limine to limit plaintiff's closing arguments, moved for a

---

[11] Davis Acura also objected to one other comment by Mr. Argue's counsel, which it did not cite here as improper, and the Court overruled that objection. 2/28/08 Tr. at 103.

35

restraining order, objected several times during closing, and moved for a mistrial at the end of

plaintiff's closing arguments.  Id. at 207 n.26.  Plaintiff's counsel began his closing arguments

with a list of 24 "misrepresentations" made by defense counsel.  He then went on to tell the jury

that the defense counsel lied throughout the case so that he could collect over a million dollars in

legal fees.  Id. at 209.  In Fineman, plaintiff's counsel continually referred to himself as truthful.

Id.  Not surprisingly, plaintiff's counsel in Fineman also called witnesses for the defense liars,

referring with incredulity to the "nerve" of the witnesses to lie "in front of a federal judge and a

federal jury."  Id. at 210.  Plaintiff's counsel also stated that he had more evidence that he had not

even introduced.  Id.  Based on this unrelenting litany of improprieties, the court of appeals

upheld the district court's grant of a new trial.  Id. at 211-12.

    Failure to object to statements made during closing arguments "precludes [a party] from

seeking a new trial on the ground of the impropriety of opposing counsel's closing remarks."

Murray v. Fairbanks Morse, 610 F.2d 149, 152 (3d Cir. 1979).  Thus, to the extent Davis Acura

bases its argument on the last three categories of statements listed above and the end of the third

quotation in the first category that came after Davis Acura's objection, Davis Acura is not

entitled to a new trial in the absence of plain error. See Amissah v. William Penn Life Ins. Co.,

No. CIV. A. 91-2857, 1993 WL 102509, at *4-5 (E.D. Pa. Apr. 7, 1993) (noting that the court

retained "the authority to review for plain error" when defendant did not object to allegedly

improper statements in plaintiff's closing arguments, "but exercise of [that] authority is seldom

justified in reviewing argument of counsel in a civil case"; citing Woods v. Burlington, 768 F.2d

1287, 1292 (11th Cir. 1985), rev'd on other grounds, 480 U.S. 1 (1987)).  Davis Acura argues

that courts have not strictly applied the requirement to object, citing Vandenbraak v. Alfieri, 209

Fed. Appx. 185 (3d Cir. 2006) (non-precedential).  Even in Vanderbraak and the case cited by

that court, Anastasio v. Schering Corp., 838 F.2d 701 (3d Cir. 1988), however, the appellate

court considered a failure to object as at least one factor in determining whether a district court

abused its discretion in refusing to grant a new trial.  Indeed, it is unclear whether the type of

review exercised in Vanderbraak and Anastasio is all that different from the type in Amissah or

Dunn v. HOVIC, 1 F.3d 1371, 1377 (3d Cir. 1993), in which the offending comments that had

not been the subject of an objection are not completely ignored, but rather reviewed for plain

error.  That is, reviewing for plain error is a way of taking the lack of objections into account

when weighing the amount of potential prejudice.

        In any case, however close the comments made by Mr. Argue's counsel may come to the

line between propriety and impropriety, they did not rise (or, perhaps more accurately, fall) to the

level of the comments in Draper and Fineman, and they did not create a reasonable probability of

prejudice.  To the extent that the comments targeted the credibility of the witnesses, such

arguments are within the proper scope of a closing argument, provided they are supported by the

record and are not stated as the personal opinion of counsel or as a vindictive assault on the

integrity of opposing counsel.  See generally 75A Am. Jur. 2d Trial § 577 (2008) and the cases

cited therein.  Here, Mr. Argue's counsel raised credibility issues by pointing to evidence in the

record of a group meeting to prepare for depositions and testimony, notes provided by counsel

and reviewed by Mr. Davis, and inconsistencies in witnesses' testimony.[12]  Such evidence is grist

---

        [12] As Mr. Argue points out, Mr. Davis was inconsistent in his testimony regarding the after-acquired evidence defense, i.e., the defense based upon the bogus customer surveys.  As to the summary judgment affidavit comments, the one isolated comment with which Davis Acura now takes issue was hardly as egregious or as broad as Davis Acura argues.  Evidence presented

for the closing argument mill when witness credibility is at issue.

Davis Acura also claims that opposing counsel's comments accused defense counsel of impropriety, which is by no means a proper subject of closing argument. As to the comment about defense counsel asking leading questions of Mr. Davis during cross-examination, the Court was quick to point the jury to their own recollections of what, if anything, was objected to during that testimony and to how the Court resolved those objections. As is addressed infra, the Court also repeatedly reminded the jury that counsel's questions were not evidence so that to a certain extent counsel's reference to his opponent's questioning style was consistent with the Court's instructions. As to any implication that counsel for Davis Acura engaged in improper conduct by conducting a group meeting with defense witnesses and providing notes to Mr. Davis to prepare him for testimony, counsel did not actually accuse defense counsel of wrongful or unethical conduct. Defense counsel was at liberty to point out to the jury that it is a routine part of an attorney's job to prepare witnesses for testimony. However, it is also a subject for fair comment for the jury's consideration in evaluating testimony. Davis Acura's comparison of opposing counsel's oratory with the conduct in Draper and Fineman is misplaced. Although Mr. Argue's counsel may have implied that defense counsel engaged in suspect conduct, counsel in the Draper and Fineman cases squarely and repeatedly accused opposing counsel of lying and

--------

at trial brought out certain inconsistencies between the affidavits and trial testimony, and Mr. Argue's counsel properly commented on that. If Davis Acura believed that a comparison between the affidavits and testimony would be misleading, or that the scope of the affidavits was not clearly explained to the jury, Davis Acura could have taken many steps to remedy that, including discussing the affidavits in its closing arguments, objecting to Mr. Argue's counsel's comment about the affidavits during closing, or requesting an instruction specifically discussing the affidavits. Davis Acura did none of these.

conspiring with clients directly in the conduct at issue in the case.  There is a great difference in such advocacy.  Plaintiff's counsel's possible attempt to hint at impropriety from such conduct may have risked crossing a line, but, even so, did not cause a level of prejudice needed to require a new trial.

Davis Acura also argues that the third category of comments listed above was improper to the extent that Mr. Argue's counsel tried to inflame the jury and garner sympathy by arguing that the customer survey evidence was introduced to make Mr. Argue look dishonest and Mr. Davis honest.  The Court finds that this commentary, albeit impassioned, was not so much an attempt at securing sympathy but a characterization of the facts of the case.  As noted above, Davis Acura neither objected to these comments at trial, nor did it even request a curative instruction.

The final category of comments, concerning the number of customer complaints, requires a slightly different analysis.  Although Davis Acura did not object to the comments, the topic was covered earlier in the trial.  Prior to closing arguments, the parties disputed whether the quantity of COP documents could be discussed in the presence of the jury because only 51 of them were produced during discovery.  Davis Acura had fought hard against producing them during discovery; Mr. Argue fought against introducing them at trial.  The parties disagreed as to when and whether it was made clear that the 51 produced documents were merely a sampling.  Eventually, the Court stated that "nobody for or on behalf of the defense can suggest directly that there were more, unless the plaintiff opens up that door.  So I am giving the plaintiff a ruling of limiting what the defendant can do, but I'm not going to make the defendant stand hog tied and allow the plaintiff then to run roughshod."  2/25/08 Tr. at 265.  Davis Acura claims that this is precisely what Mr. Argue did by bringing up the number of COP documents in his rebuttal

argument, after which Davis Acura did not have the opportunity to respond.  Certainly, at the time all of this transpired at trial Davis Acura made no such request for further briefing or argument.

What Davis Acura fails to mention, and what Mr. Argue brings up in his response to Davis Acura's motion, is that earlier in the trial, the Court ruled that "there will be no suggestion to the jury by any counsel, by any presentation of evidence, by any witness that there are more . . . COPs than . . . the 51 that have been produced in this case."  2/26/08 Tr. at 8-9.  The Court instructed counsel that if any implication was made that there were more than 51 COPs that counsel could request, and the Court would give, an instruction to the jury that there were only 51 COPs in evidence in the case.  Id.  If the ruling did not satisfy Davis Acura for some reason there was opportunity before closings to iron out the difficulties or concerns.  By "doing the math" hypothetically and computing through extrapolation from other evidence that there were 51 COPs out of thousands of service orders, Mr. Argue's counsel technically did not run afoul of the Court's directive.  Moreover, as noted before, Davis Acura failed to object to this characterization or extrapolation of the evidence at the time and can not raise an objection now that it is unhappy with the outcome of the case.

Furthermore, to the extent that any of counsel's comments crossed into the realm of improper, the Court's instructions curbed the possibility of prejudicial harm.  Specifically, the Court instructed the jury:

> [Y]ou must not be persuaded by any bias, any prejudice or any sympathy for or against any of the parties or the people involved in this case.

2/28/08 Tr. at 110.

40

[Y]ou must do your job as jurors without regard to sympathy, prejudice or passion for or against either side.

Id. at 111-12.

As I instructed you at the start of the case, let me remind you that the lawyers' statements and arguments are not evidence. Likewise, if a lawyer asked a witness a question that contained what sounded like an assertion of a fact, you may not consider the assertion in the lawyer's question as evidence of the fact. The lawyer's questions and statements simply are not evidence. Only the witnesses' answers in response to the questions are evidence.

Id. at 114.

As you, by now, know, the following are not evidence: The statements, arguments and questions of the lawyers, the objections by the lawyers, any testimony or exhibits that I told you to disregard or that I excluded from evidence and anything you may have seen or heard about the case outside of the courtroom.

Id. at 119.

During the trial, you have heard the attorneys use the term inference . . . The plaintiff asks you to draw one set of inferences while the defense asks you to draw another. It is for you and you alone to decide what inferences, if any, you will draw.

Id. at 127.

Do not let bias, sympathy or prejudice that you may feel to one side or to anybody in this case, influence your decision in any way.

Id. at 135.

In light of the Court's instructions, there was no bona fide probability that Plaintiff's counsel's remarks improperly influenced the verdict. Davis Acura's Motion for a New Trial is therefore denied.

C.      *Defendant's Motion to Alter or Amend the Verdict Pursuant to Rule 59(e)*

Davis Acura also moves to alter or amend the verdict pursuant to Federal Rule of Civil

Procedure 59(e).  Under that Rule, a judgment may be altered or amended because of: "(1) an

intervening change in the controlling law; (2) the availability of new evidence that was not

available previously; or (3) the need to correct a clear error of law or fact or to prevent manifest

injustice."  Tomasso v. Boeing Co., Civil Action No. 03-4220, 2007 WL 2458557 at *1 (E.D. Pa.

Aug. 24, 2007) (citing Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677

(3d Cir. 1999) (internal citations omitted)).  Davis Acura asserts that the evidence in the case

supported only an award of $10,000 for the cost of a replacement vehicle, despite the jury's

award of $18,000, and that the Court should reduce that portion of the award to conform to the

evidence and to correct a clear error of fact.  At oral argument on the instant motions, counsel for

Mr. Argue agreed that the facts of the case supported an award of only $10,000 for the cost of a

replacement vehicle.  7/7/08 Tr. at 10; see also 2/21/08 Tr. at 95-96.  Therefore, given that Mr.

Argue acknowledges the validity of the defense argument in this regard and based on the clear

and undisputed evidence, the Court grants Davis Acura's Motion to Alter or Amend the Verdict

Pursuant to Rule 59(e), and Mr. Argue's overall damage award will be reduced by $8,000.

D.      *Plaintiff's Motions to Mold the Verdict*

Also pending before the Court are three motions filed by Mr. Argue to mold the verdict.

1.      Backpay Award

The first is Mr. Argue's Motion to Mold the Verdict/Amend the Judgment So As To

Increase the Lost Wages Component of the Back Pay Award to the Full Amount Required by

Law and/or As Established by the Properly Admitted Evidence at Trial.  Mr. Argue contends that

the amount of the jury's award for lost wages was improper as a matter of law because he was entitled to backpay from the date of discharge, January 2, 2001, to the date of the verdict, February 29, 2008, in light of the jury's findings that he made reasonable efforts to mitigate and that Davis Acura failed to prove its after-acquired evidence defense. He asserts that backpay, unlike front pay, is mandatory in accordance with the "make whole policy" of discrimination law. Mr. Argue claims that there was no evidence that he did not intend to remain indefinitely in the position of service manager at Davis Acura, that he was unavailable to perform the job at any time during the backpay period, or that the position was changed or eliminated. He cites the Court's instruction to the jury that "Davis Acura need not reimburse Mr. Argue for salary loss attributable to Mr. Argue himself that is unrelated to employment discrimination" as proving the converse, i.e., that if the jury found in favor of Mr. Argue as to the mitigation issue, then no salary loss was "attributable to Mr. Argue himself" and he is entitled to a full award of backpay.

Mr. Argue further contends that the testimony of Davis Acura's expert, Dr. Staller, was improperly admitted. Dr. Staller testified that based on Mr. Argue's work history, he averaged 2.9 years at each job. See 2/25/08 Tr. at 143. Based on that assumption of tenure, Dr. Staller opined that Mr. Argue would have left his job at Davis Acura roughly six months after he was terminated, and, therefore, was only entitled to damages for the six months following his termination. See id. at 148. Mr. Argue asserts that this assumption is contrary to the law relating to backpay, in that it suggests that limiting a backpay award is not proper when a plaintiff has been reasonably diligent in mitigating his damages. He argues that the jury appears to have taken Dr. Staller's estimate of 2.9 years of tenure and awarded backpay for roughly that amount of time after Mr. Argue's discharge. He supports this interpretation by pointing to a chart submitted by

43

his expert, Mr. Verzilli, which broke out backpay awards by year and noting that the total of the amounts for the first three years after termination is $106,669–close to the $107,000 awarded by the jury.

In support of his arguments, Mr. Argue cites cases which he contends hold that a full backpay award is mandatory.  For instance, he cites Maxfield v. Sinclair Int'l, 766 F.2d 788 (3d Cir. 1985), in which the Third Circuit Court of Appeals held that Social Security benefits are not a proper setoff to a backpay award, applying the reasoning of Title VII cases in which the court found that the "make whole" purpose of discrimination statutes would not be served by allowing setoffs for Social Security benefits, welfare programs, or unemployment compensation and noting that backpay awards are mandatory under the ADEA.  See id. at 794-96.

Davis Acura responds by contending that Mr. Argue provided no persuasive legal authority to support increasing his backpay award.  It also argues that another chart submitted by Mr. Verzilli could have supported the jury's verdict.  In that chart, Mr. Verzilli concluded that if Mr. Argue had maintained his job at Ardmore Acura, his backpay would be $100,431, which Davis Acura argues is close to the $107,000 awarded.[13]  Davis Acura asserts that in any case, any guess as to how the jury arrived at its verdict is purely speculative.  It counters that the Maxfield case, cited by Mr. Argue in support of his argument that a "full" backpay award is mandatory, holds only that backpay is a mandatory element of damages in an ADEA case, but does not mandate any particular formula or equation for setting the amount.

---

[13] The Court observes that the chart to which Davis Acura refers set forth calculations of backpay based on the assumption that the jury accepted Davis Acura's argument that Mr. Argue failed to mitigate his damages when he lost his job at Ardmore Acura.  Because the jury specifically found that Mr. Argue did make reasonable efforts to mitigate his damages, Davis Acura's interpretation of the jury's basis for its award likely is not correct.

The measure of a backpay award is generally "the difference between the salary an employee would have received but for a violation of the ADEA, less severance pay, and the salary actually received from other employment." Berndt v. Kaiser Aluminum & Chem. Sales, Inc., 604 F. Supp. 962, 964 (E.D. Pa. 1985), aff'd 789 F.2d 253 (3d Cir. 1986). "The relevant period for measuring back pay begins at the time of the loss of employment resulting from the violation and ends at the time of trial." Id. The proper amount and time period of backpay, however, depend upon the facts introduced at trial. See, e.g., E.E.O.C. v. Mike Smith Pontiac GMC, Inc., 896 F.2d 524, 529-30 (11th Cir. 1990) (holding in a Title VII case that although the time period of backpay awards is usually presumed to be from discharge to reinstatement, the district court did not err in limiting plaintiff's backpay award based on evidence of the average tenure of employees at defendant's place of business); Finch v. Hercules Inc., 941 F. Supp. 1395, 1415-17 (D. Del. 1996) (upholding award of damages less than the amount plaintiff sought and approving of expert testimony that despite plaintiff's testimony, plaintiff was likely to retire before the time of trial, thereby cutting off his backpay award).

Here, both parties introduced evidence regarding the measure of backpay. For instance, Mr. Argue introduced the testimony of Mr. Verzilli calculating backpay, as well as his own testimony that he intended to stay at Davis Acura until he retired. Davis Acura introduced the testimony of Dr. Staller[14] calculating backpay based on evidence of Mr. Argue's history of job tenure. Given the conflicting evidence and opinions presented, it is not surprising that the jury's

---

[14] The issue of Dr. Staller's appearance as an expert witness was one of the many vigorously contested issues during pre-trial proceedings. The Court ruled that Dr. Staller and his proposed expert witness opinion were not inappropriate for this case. Mr. Argue presents no new grounds for challenging the Court's ruling, and the Court sees no reason to revisit that issue now.

verdict does not precisely or neatly and obviously conform to either party's argument as to what amount it should award.  The jury was not bound to accept either version of the facts wholesale.  Indeed, the jury was free to doubt Mr. Argue's self-serving testimony that he would have remained at Davis Acura indefinitely, just as it was free to accept or reject some or all of the experts' conflicting opinions and calculations.

Mr. Argue's assertion that the award is inconsistent with the law, including the law as set forth by the Court in its jury instructions, considerably overstates the clarity of the law on backpay.  The jury instructions in this case do not foreclose an award of backpay damages that is less than that estimated by Mr. Verzilli.  The cases cited by Mr. Argue, although they do hold that backpay is a mandatory remedy in ADEA cases, do not hold that the award must be the full amount demanded by plaintiff, without regard to the particular facts of the case.

Mr. Argue has not shown that an adjustment of the jury's backpay award is necessary to correct a clear error of law or fact, or to prevent manifest injustice.  His Motion to Mold the Verdict/Amend the Judgment So As To Increase the Lost Wages Component of the Back Pay Award to the Full Amount Required by Law and/or as Established by the Properly Admitted Evidence at Trial is denied.

### 2.     Negative Federal Income Tax Consequences

Mr. Argue's second motion under Rule 59(e) is his Motion to Alter/Mold the Judgment/Verdict to Include an Appropriate Amount to Compensate Plaintiff for the Negative Federal Income Tax Consequence of the Verdict/Judgment for Back Pay.  Mr. Argue asks the Court to increase the amount of his award to reflect the fact that receiving a lump sum award means that he will have to pay federal income tax on the entire award in the year it is received,

which would defeat the "make whole" purpose of discrimination laws.

Until very recently, the Third Circuit Court of Appeals had not addressed this issue, and district courts within the Third Circuit were split on the issue.  Compare O'Neill v. Sears, Roebuck & Co., 108 F. Supp. 2d 443, 446-48 (E.D. Pa. 2000) (amending judgment to include award for negative income tax consequences) with Becker v. ARCO Chem. Co., 15 F. Supp. 2d 621, 638 (E.D. Pa. 1998) (denying motion to amend judgment to account for negative income tax consequences).

Mr. Argue attached to his motion Mr. Verzilli's calculations of the amount of money necessary to compensate Mr. Argue for the negative tax consequences, in which Mr. Verzilli took the entire jury award, including backpay and lost benefits, added it to Mr. Argue's present yearly income, and calculated Mr. Argue's 2007 tax rate to arrive at a tax rate of 16.62%.  He then determined what Mr. Argue's tax rate would have been in 2003 had he remained at Davis Acura at a salary comparable to his salary for the years he was employed there.[15]  To arrive at his estimated negative tax impact, he subtracted the 2003 tax rate from the 2007 tax rate and multiplied the lump sum award by the difference in tax rates.

Davis Acura opposes Mr. Argue's motion, contending that Mr. Argue did not set forth any persuasive legal authority for compensation for negative tax consequences and that Mr. Verzilli's calculations were speculative.

In January of 2009, the Third Circuit Court of Appeals addressed the issue of increasing an award to compensate for negative income tax consequences.  In Eshelman v. Agere Sys., Inc.,

---

[15] Mr. Verzilli's calculations on both pre-judgment interest and negative tax consequences appear to be based on the assumption that the jury used his damages chart and awarded backpay for a three-year period following Mr. Argue's termination.

No. 05-4895, 2009 WL 223858 (3d Cir. Jan. 30, 2009), the circuit court upheld an additional

award to offset the negative income tax consequences of a backpay award in an ADA case.  The

court cautioned, however, that in upholding the award in Eshelman, it was not suggesting that all

plaintiffs are presumptively entitled to an award to offset tax consequences, noting that the

district courts have "wide discretion" to "locate a just result . . . in light of the circumstances

peculiar to the case."  Id. at *13 (internal citations omitted).

This is not a case in which the equities demand additional compensation for any negative

tax consequences; nor is Mr. Verzilli's affidavit or calculation unhampered by speculation.  For

instance, Mr. Verzilli uses 2007 as the tax year in which Mr. Argue would receive his award and

suffer tax impact, despite the fact that the trial took place in 2008, making 2008 the earliest

possible year that Mr. Argue would receive the judgment.  Of course, it is now 2009 and, to say

the least, the question of federal income tax rates is in its own state of flux and speculation.

Moreover, given that Mr. Argue's tax returns are available for each year between his termination

and trial (and were in fact introduced as exhibits at trial), estimating the tax impact by using one

year as a comparison ignores the fact that information about more than one year is readily

available.  See Loesch v. City of Philadelphia, Civil Action No. 05-cv-0578, 2008 WL 2557429,

at * (E.D. Pa. June 19, 2008) (awarding compensation for negative tax consequences, but

rejecting Mr. Verzilli's calculations, in which he used a methodology similar to the one used in

this case, as not properly grounded in the facts of the case).  Such "moving targets" are hardly a

proper basis for a damage award.

In short, Mr. Argue has failed to present the Court with a reliable estimate of the negative

income tax consequences of his lump sum award, let alone equitable arguments compelling such

an award under the facts of this case.  Because Mr. Argue has failed to carry his burden in proving to the Court that he was entitled to such an award and that the amount requested is not speculative, Mr. Argue's Motion to Alter/Mold the Judgment/Verdict to Include an Appropriate Amount to Compensate Plaintiff for the Negative Federal Income Tax Consequence of the Verdict/Judgment for Back Pay is denied.

>    3.    Pre- and Post-Judgment Interest

Mr. Argue's final Rule 59(e) motion is his Motion to Alter/Mold the Judgment/Verdict to Include an Award of Prejudgment Interest on Back Pay and in Re Post-Judgment Interest.  The request for post-judgment interest is unopposed.  Mr. Argue is entitled to post-judgment interest under 28 U.S.C. § 1961.

In this Circuit, there is "a strong presumption in favor of awarding prejudgment interest, except where the award would result in 'unusual inequities.'"  Booker v. Taylor Milk Co., Inc., 64 F.3d 860, 868 (3d Cir. 1995).  Davis Acura argues that awarding Mr. Argue prejudgment interest would be inequitable, but does not explain how such an award would be a "windfall" to the Plaintiff.  Indeed, this case is not an "unusual" one, such that an award of prejudgment interest would serve any purpose other than to compensate Mr. Argue for the loss of use of money to which the jury decided he was entitled.

Mr. Argue asks for prejudgment interest on his damages for lost wages, lost use of company car, and health insurance premiums.  He cites Rush v. Scott Specialty Gases, Inc., 940 F. Supp. 814, 817-19 (E.D. Pa. 1996), as supporting his request for prejudgment interest on his entire "backpay" award, rather than just his lost wages.  Davis Acura counters that Rush holds that prejudgment interest is only available for a lost wages award, and thus supports its argument

49

that Mr. Argue, if he should receive any prejudgment interest at all, should receive it only on the lost wages award.

Neither party gets it completely right.  In <u>Rush</u>, the plaintiff argued that she should receive prejudgment interest not just on her award of backpay, but also on front pay, pain and suffering damages, and punitive damages.  <u>Id.</u> at 816.  The court held that she was not entitled to prejudgment interest on anything except her lost wages award.  <u>Id.</u> at 818.  Lost benefits do not appear to have been at issue in <u>Rush</u>, so Mr. Argue is incorrect in construing this case to hold that he is entitled to prejudgment interest on all components of his damages award.  On the other hand, however, Davis Acura is incorrect in claiming that <u>Rush</u> precludes a prejudgment interest award on lost benefits, as well as lost wages, again, because that was not an issue in <u>Rush</u>.

What <u>Rush</u> does discuss is the compensatory nature of prejudgment interest, stating that the "purpose of awarding prejudgment interest is to compensate a plaintiff for the loss of use of money that she would otherwise have earned," distinguishing lost wages from front pay (i.e., money the plaintiff would have earned in the future) and pain and suffering and punitive damages (i.e., money that she would not have earned but for the jury verdict).  <u>Id.</u> at 817.  This distinction lends support to Mr. Argue's contention.  The lost benefits award, like his lost wages award, compensates him for money he would have been entitled to in the past (either as compensation or as avoidance of expenses) had it not been for Davis Acura's actionable conduct.

The <u>Rush</u> court also discusses a case from another district, <u>Luciano v. Olsten Corp.</u>, 912 F. Supp. 663 (E.D.N.Y. 1996), which awarded prejudgment interest on both backpay and other expenses incurred by the plaintiff as a result of wrongful termination, including job search expenses and IRA early withdrawal penalties.  The <u>Rush</u> court distinguished <u>Luciano</u>, which

awarded prejudgment interest to "prevent an employer from attempting to enjoy an interest-free

loan for as long as it can delay paying out back wages. . .by compensating the plaintiff for the

value of the money she lost over time due to defendants' discriminatory acts," from the case

before it, which involved money to compensate for future losses and that would not have been

earned without a jury verdict.  Id. (internal quotations omitted).  Again, although the Rush court

did not address the issue at hand, its reasoning and characterization of the Luciano case support

Mr. Argue's side of the issue.

 Davis Acura also argues that the Court should not penalize the defendant by awarding

prejudgment interest for the time period during which this litigation was stayed (i.e., June 23,

2004[16] through October 25, 2006).  It asserts that because the march toward judgment was

delayed through no fault of the Defendants, the Defendants should not have to pay prejudgment

interest for that time period.  Defendant is essentially correct that it played no active role in how

long this case languished while Mr. Argue and/or his counsel failed to figure out how to find

replacement counsel or otherwise advance Mr. Argue's position in the litigation, although it

bears mentioning that the disqualification of counsel that triggered the lengthy dormant period

was caused in the first instance by Defendants' motion seeking opposing counsel's

disqualification.

 In any event, Davis Acura cites no case law in support of its argument.  In fact, in

considering an award of prejudgment interest in a Title VII case, another court in this district

rejected a similar argument.  Robinson v. Southeastern Pa. Trans. Auth., No. CIV. A. 87-5114,

---

[16] June 23, 2004 is the date the parties voluntarily agreed to stay the case pending a
decision on the Defendants' Motion to Disqualify Plaintiff's Counsel.  That motion was granted
on November 4, 2004, but the Court vacated the order granting that motion on October 25, 2006.

1993 WL 126449 (E.D. Pa. Apr. 21, 1993). In Robinson, the case was delayed by the plaintiff's search for counsel, much like the delay complained of here when the case was stayed while Mr. Argue's counsel was disqualified. See id. at *2. The Robinson defendant claimed not only that it would be inequitable to award prejudgment interest under the circumstances, but also that plaintiff's delays actually prejudiced the defendant in its ability to prepare for trial. The court found that the delays were excusable and that the defendant failed to point to any specific prejudice suffered as a result of the delays, and that therefore the defendant failed to show that the delay overcame the presumption that the plaintiff receive prejudgment interest. Id.

Likewise, Davis Acura has failed to show how the delay caused by the disqualification of Plaintiff's counsel should persuade this Court to disturb the presumption in favor of a full award prejudgment interest. Davis Acura was, after all, found to have treated Mr. Argue in a discriminatory manner and thus put itself in the position of having to compensate Mr. Argue some day for the resulting damages, the value of which Davis Acura enjoyed during the period of the delay in the case.

The final issue to be considered on this topic is how to calculate prejudgment interest. Mr. Argue advocates either a 6% Pennsylvania state statutory rate or a rate called for by the post-judgment interest statute, 28 U.S.C. § 1961, based on Treasury bill rates. The Third Circuit Court of Appeals in Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 63 (3d Cir. 1986), stated that in awarding prejudgment interest, a district court "may be guided by the rate set out in 28 U.S.C. § 1961," and district courts in this circuit have applied this method of calculating prejudgment interest in ADEA cases. See, e.g., Young v. Lukens Steel Co., 881 F. Supp. 962, 978 (E.D. Pa. 1994); O'Neill v. Sears, Roebuck & Co., 108 F. Supp. 2d 443, 445 (E.D. Pa.

2000).  Thus, the Court will adopt this method here.  Due to the Court's decision to reduce the

amount of Mr. Argue's damages by $8,000 to mold the verdict to conform to the evidence

regarding Mr. Argue's lost car expenses, Mr. Verzilli's previous interest calculations do not

accurately provide the correct amount of interest to be awarded.  The Court therefore orders that

Mr. Argue provide a prejudgment interest calculation that takes into account the reduction of his

award and using Treasury bill rates.

     D.     *Plaintiff's Petition for Attorney's Fees*

The final motion before the Court is Mr. Argue's Petition for Attorney's Fees.  Under the

ADEA, a prevailing plaintiff is entitled to an award of attorney's fees.  See 29 U.S.C. § 626(b);

see also Blum v. Witco Chem. Corp., 829 F.2d 367, 377 (3d Cir. 1987).  A court calculates the

appropriate fee award by "'multiplying the number of hours reasonably expended on the

litigation [by] a reasonable hourly rate,'" which is called the "lodestar."  Tobin v. Haverford

Sch., 936 F. Supp. 284, 287 (E.D. Pa. 1996) (quoting Blum v. Stenson, 465 U.S. 886, 888

(1984)).  From a procedural standpoint,

> [t]he party seeking attorney's fees has the burden to prove that its request for attorney's
> fee is reasonable.  To meet its burden, the fee petitioner must submit evidence supporting
> the hours worked and rates claimed.  In a statutory fee case, the party opposing the fee
> award then has the burden to challenge by affidavit or brief with sufficient specificity to
> give fee applicants notice, the reasonableness of the requested fee.  The district court
> cannot decrease a fee award based on factors not raised at all by the adverse party.  Once
> the adverse party raises objections to the fee request, the district court has a great deal of
> discretion to adjust the fee award in light of those objections.

Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990) (internal citations and quotations

omitted).  The Court of Appeals for the Third Circuit has explained how specific a fee petition

should be:

> A fee petition should include "some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates." However, "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." We found sufficient specificity where the computer-generated time sheet provided "the date the activity took place."

Keenan v. City of Philadelphia, 983 F.2d 459, 473 (3d Cir. 1992) (internal citations omitted).

Thus, a district court has "a positive and affirmative function in the fee fixing process, not merely a passive role." Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 178 (3d Cir. 2001). "In reviewing a fee application, a district court must conduct "'a thorough and searching analysis.'" Interfaith Community Organization v. Honeywell Intern., Inc., 426 F.3d 694, 703 (3d Cir. 2005) (quoting Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 362 (3d Cir. 2001)). The Court must determine the reasonableness of both the number of hours expended, as well as the proposed hourly rate. Tobin, 936 F. Supp. at 288. The appropriate hourly rate for attorney's fees purposes is the prevailing market rate in the relevant community, i.e., the "rate charged by attorneys of equivalent skill and experience performing work of similar complexity." Student Pub. Interest Res. Group of N.J., Inc. v. AT&T Bell Labs., 842 F.2d 1436, 1450 (3d Cir. 1988). In each of these matters, the presiding court has considerable discretion when evaluating fee petitions. Bell v. United Princeton Properties, Inc., 884 F.2d 713, 721 (3d Cir. 1989).

From the foregoing general background of governing caselaw, the following operative principles emerge for application here:

- Mr. Argue has the burden to prove the fee petition is reasonable both as to the time expended and the rate charged by submitting credible supporting evidence.

- Davis Acura's challenge to the fee petition must be based upon articulated objections,

not merely a general statement of dispute.

• The Court has an active, not a passive or "rubber stamp," role to perform in reviewing the petition and approving a fee.

The Court has reviewed counsel's petition and the purported support for both the time and rates used to support the petition. The Court has also carefully reviewed the competing briefs on these issues, giving particular additional attention to those items specifically challenged by Davis Acura. The Court has also reviewed the docket of the long history of this litigation. Of course, the Court's consideration of the competing motions discussed above required the Court's review of the trial transcript which necessarily served the dual purpose of reminding the Court of the events and progress of trial as related to the fee petition issues as well. Thus, the Court's ruling with respect to the fee petition is informed by the applicable law, by the procedural and substantive record and by the Court's firsthand observations.

Davis Acura's objections to the fee petition fall into several categories: (1) lack of specificity in billing detail (i.e., so-called "block billing"); (2) excessive or wasted time spent on specific tasks; (3) time charged during the period (November 4, 2004 to October 25, 2006) of counsel's disqualification from this litigation; (4) excessive rates charged; and (5) reduction of the fee for the degree of success.

### 1.     Lack of Specificity in Recorded Time

Counsel's fee petition does not present monthly bills or time sheet summaries created contemporaneously with the time segments shown. While the Court declines to describe the submission created wholly "after the fact," the Court must observe that the lion's share (e.g., from 2/8/02 to 2/29/08) of the time presented appears in a single document generated on March

1, 2008 (Petition "Ex. B of Ex. 1"), with all services for calendar year 2001 also summarized in a single document, to wit, Petition "Ex. A of Ex. 1."  The Court also notes that the manner of recording time was essentially consistent, namely entries made by date and by provider without breaking out the time expended on a task-by-task basis.  However, as the months and years reflected in these exhibits progressed, longer and longer daily descriptions appear in the daily entries, making it even more and more problematic for the Court to try to discern how much time was devoted to a given task or grouping of similar tasks, or to compare the time recorded by two different providers for the same meeting or conference on the same day.  For example, in some single day entries as many as nine or more separate and decidedly different types of tasks are recorded for a single "block" of a provider's time (see, e.g., CJW 9/15/03; CJW 11/13/03; CJW 5/31/06; JAS 2/5/07; JAS 3/20/07; CJW 3/2/07; JAS 1/15/08; among many others).  The Court does not expect minute by minute entries by counsel; or even narrow task-by-task separate entries.  However, such large chunk "block billing" as employed by counsel in this instance thwarts the Court in the performance of its review obligations and certainly does not reasonably meet the spirit of the obligation to provide "some fairly definite information as to the hours devoted to various general activities" and by whom.  Therefore, without visiting an undue or harsh penalty on counsel for its choice in time recording practices, the Court is applying a 10% reduction of the hours in the petition in response to the impediments caused by the block billing method.

2.      Excessive or Wasted Time

Davis Acura takes great umbrage at certain of the activities undertaken by Mr. Argue's counsel.  The Court must observe that, as is true in many cases and certainly in this one, "it takes

two to tango." Many hours were expended in this case that, upon reflection, ought not to have had to be spent by anyone. To the extent some of that was caused by plaintiff's counsel, the 10% reduction applied above and the reductions elsewhere in this ruling will fairly account for plaintiff's counsel's contributions. To the extent it was prompted by the defense, that is addressed by the approval of the fees that are approved. However, in one particular regard the Court determines that it is appropriate to make a specific reduction of the fee of one hour per trial day, that is an aggregate of an 8-hour reduction of lead trial counsel's time, due to the Court's assessment that certain of his chosen methods of introducing or attempting to introduce evidence or to cross-examine witnesses were improper and unnecessarily led to excessive or redundant trial time for the jury, for counsel and for the Court.[17]

3.      Fees Requested for Services During Period of Disqualification

Mr. Argue's counsel and counsel's firm was disqualified from this case for almost two years between November 4, 2004 and October 25, 2006 pursuant to an order of the presiding judge in this case at that time. After the case was transferred to this Court's docket, the Court–without substantive or useful assistance from counsel–reviewed the record, researched various additional legal issues, elicited supplemental factual material and determined, virtually sua sponte, that it was not inappropriate to then permit counsel to re-enter his appearance on behalf of the plaintiff who had been either unwilling or unable to locate new counsel willing to

---

[17] The Court recognizes that opposing counsel characterizes this issue as reflecting a lack of skill or experience. The Court is not adopting that criticism. It is at least possible that counsel deliberately chose his particular techniques for some strategic reason. It was equally puzzling to the Court that opposing counsel did not object to counsel's technique, or request a sidebar conference to address the problem which did, indeed, become virtually chronic at times. In any event, the approach adopted by counsel was time-consuming to the extent of at least 8 hours of otherwise wholly unnecessary trial time.

continue the litigation after counsel had been disqualified.  Under any circumstance, in this case

as it developed and in view of the manner in which the disqualification came about and was

ultimately resolved, the Court sees no reason to permit counsel to recover fees for time recorded

during the period of disqualification.  Therefore, no fees for any time recorded between

November 4, 2004 and October 25, 2006 will be approved.

### 4.       The Challenge to Counsel's Hourly Rates

Davis Acura contends for a variety of reasons that the hourly rates charged by opposing

counsel's personnel are excessive.  Mr. Argue's counsel counters that the rates are justified and

are well within the range of customary rates.[18]  The Court accepts the general proposition that

looking at 2008 (the date of the last services recorded) the presented rates are not, on the surface,

so off-the-mark as to prompt their wholesale rejection here.

However, in two respects, the Court determines that a rate change and re-calculation is

warranted.  First, because Ms. Starita was not a licensed attorney at any time she performed

services on this case, the hourly rate applied to her time will be reduced to one half that allowed

for Ms. Crisci and calculated hereinafter on that basis.  Second, and more significantly, the Court

notes that the fee petition is computed using the same hourly rates for all services throughout the

2001 through 2008 life of this litigation.  Specifically, counsel's affidavit at paragraphs 16-18,

together with the summary billing statements attached as exhibits, make it abundantly clear that

counsel's 2008 hourly rates for "contingent fee civil rights cases" were used to compute the

entire fee petition.  No information about the firm's rates for earlier years going back to 2001 was

---

[18] However, counsel also acknowledges that it is appropriate for the Court to consider, as
the Court does, the fact that contemporaneous Community Legal Services rates range from $325
to $410 per hour for an attorney of Mr. Weiss's experience.

presented.  The Court considers it at least highly improbable that counsel was charging the same

rates throughout the life of this case.[19]  Therefore, the Court is adjusting the allowable rates to be

applied to the allowable time as follows:

- For allowable time for services recorded for 2001 and 2002, 80% of the 2008 rates shown will be permitted.

- For allowable time for services recorded for 2003 and 2004, 90% of the 2008 rates shown will be permitted.

- For allowable time for services recorded for 2005 and 2006, 95% of the 2008 rates shown will be permitted.

- For allowable time for services recorded for 2007 and 2008, 100% of the 2008 rates shown will be permitted.

5.      Application of a "Degree of Success" Factor

Part of the process of exercising the judicial obligation and discretion to review fee

petitions is to incorporate meaningful consideration of a prevailing party's "degree of success."

At times, in some cases, fees can and should be computed only for or as to successful claims or

successful work.  Rode, 892 F.2d at 1183, 1186; Younger v. City of Philadelphia, Civ. A. No.

88-6133, 1990 WL 87378, at *3, n.7 (E.D. Pa. June 19, 1990).  However, given the vagaries of

virtually all litigation generally, and employment discrimination or similar litigation in particular,

---

[19] The Court recognizes that petitioning counsel does not expressly state that the same rates were in effect for the full time period, but neither does he go out of his way to be particularly clear on the point.  Indeed, the March 17, 2008 affidavit simply states that the rates are "current" rates.  However, by implication, the computations used in the summary billing statements use only the "current" rates for computing the value for all the services, even those performed as much as seven years earlier.

those instances may be rare.  It is neither mandated nor realistic to demand that counsel delineate precisely the specific services that related to a successful argument, theory or claim.  Likewise, the Court would not require counsel to cleanly remove those that were ultimately unproductive. Indeed, it is conceivable that if one were able to deconstruct jury verdicts, all counsel and the court would be confounded to learn what efforts were and were not productive.  The outcome in some cases may turn on nothing counsel did, others on only counsel's efforts.  Such are some of the mysteries of the jury system.  The Court will not apply a formulaic ratio based upon numbers of causes of action pled in the original complaint, the number of original defendants, the damages demanded or volleying settlement proposals.  This verdict can not be described as a "resounding success," but it was enough of a plaintiff's victory for the defense to labor mightily to try to overturn it.  Thus, the Court believes both the <u>fact</u> of the verdict in Plaintiff's favor and the amount ought to be considered.

On the basis of the foregoing discussion, and after weighing and balancing all of the matters discussed above, including the propriety of including an overall degree of success factor, the Court concludes that counsel's fee petition–after accounting for the adjustments set out above–should be approved for 70% of the adjusted amount.[20]  Payment of costs in full, namely $16,787.85, will be approved.

---

[20] The Court considers this percentage to be almost indulgent of counsel.  Counsel made it clear that the case was originally accepted on a contingent fee basis, and, as such, counsel was certainly at risk of recovering no fee.  Counsel deserves to enjoy some benefit for the achievement.  Simply for comparison purposes, a contingent one-third fee recovery would have produced a fee of approximately $40,000; a 40% fee would have been roughly $48,000; and a 50% fee would have been about $60,000, recognizing some further adjustments for pre- and post-judgment interest would be necessary.

<u>Summary of Approved Fees</u>

Taking all of the adjustments discussed above, the approved fees are as follows:

**1/1/01 to 12/31/01 (with rates set at 80% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 18.2 | 11.1 | 0 | 0 | 0 | 0 |
| rate | $340 | $220 | 0 | 0 | 0 | 0 |
| total fee | $6,188 | $2,420 | 0 | 0 | 0 | 0 |

**1/1/02 to 12/31/02 (with rates set at 80% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 33.4 | 0 | 0 | 0 | 0 | 0 |
| rate | $340 | 0 | 0 | 0 | 0 | 0 |
| total fee | $11,356 | 0 | 0 | 0 | 0 | 0 |

**1/1/03 to 12/31/03 (with rates set at 90% of the billing rates requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 124.8 | 12.3 | 0 | 0 | 0 | 2 |
| rate | $382.50 | $247.50 | 0 | 0 | 0 | $180 |
| total fee | $47,736 | $3,044.25 | 0 | 0 | 0 | $360 |

**1/1/04 to 11/4/04 (with rates set at 90% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 185.4 | 29.8 | 0 | 0 | 0 | 0 |
| rate | $382.50 | $247.5 | 0 | 0 | 0 | 0 |
| total fee | $70,915.50 | $7,375.50 | 0 | 0 | 0 | 0 |

**11/5/04 to 12/31/04 (with rates set at 90% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 5.9 | 3.5 | 14.6 | 0 | 0 | 0 |
| rate | $382.50 | $247.50 | $202.50 | 0 | 0 | 0 |
| total fee | $2,256.75 | $866.25 | $2,956.50 | 0 | 0 | 0 |

**1/1/05 to 12/31/05 (with rates set at 95% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 14.9 | 0 | 1.9 | 0 | 0 | 0 |
| rate | $403.75 | 0 | $213.75 | 0 | 0 | 0 |
| total fee | $6,015.88 | 0 | $406.13 | 0 | 0 | 0 |

**1/1/06 to 10/24/06 (with rates set at 95% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 32.8 | 0 | 11.8 | 0 | 0 | 0 |
| rate | $403.75 | 0 | $213.75 | 0 | 0 | 0 |
| total fee | $13,243 | 0 | $2,522.25 | 0 | 0 | 0 |

**10/25/06 to 12/31/06 (with rates set at 95% of the billing rate requested)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 22 | 0 | 0 | 0 | 0 | 0 |
| rate | $403.75 | 0 | 0 | 0 | 0 | 0 |
| total fee | $8,882.50 | 0 | 0 | 0 | 0 | 0 |

**1/1/07 to 12/31/07 (with rates set at 100% of the billing rate requested, with the exception of the rate for Ms. Starita, which is set at 50% of the billing rate requested for Ms. Crisci)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 110.8 | 0 | 0 | 0 | 57.9 | 0 |
| rate | $425 | 0 | 0 | 0 | $112.5 | 0 |
| total fee | $47,090 | 0 | 0 | 0 | $6,513.75 | 0 |

**1/1/08 to 3/17/08[21] (with rates set at 100% of the billing rate requested, with the exception of the rate for Ms. Starita, which is set at 50% of the billing rate requested for Ms. Crisci)**

|  | Charles J. Weiss | Ann Thornburg Weiss | Carol Crisci | Joshua Ganz | Julie Starita | Joseph Brian Tuk |
|---|---|---|---|---|---|---|
| hours | 382[22] | 0 | 0 | 8.7 | 190.3 | 0 |
| rate | $425 | 0 | 0 | $225 | $112.5 | 0 |
| total fee | $162,350 | 0 | 0 | $1957.50 | $21,408.75 | 0 |

Using the information set forth in the charts above, the grand total of fees, after the rate adjustments prescribed by the Court, is $425,864.51.  From this, the Court will subtract all fees for the disqualification period between November 4, 2004 and October 25, 2006, which reduces the total amount of fees to $397,597.75.  The Court will next deduct 10% from that figure due to block billing, making the new total $357,837.98.  Finally, the Court will reduce the fees to $250,486.59 (70% of $357,837.98) to reflect the "degree of success."

An Order consistent with this Memorandum follows.

BY THE COURT:

_____

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

[21] March 17, 2008 is the last date for which plaintiff's counsel has submitted billing information.

[22] This number reflects a deduction of 8 hours of counsel's time, in accordance with this Court's ruling above.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT E. ARGUE, III, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| DAVID DAVIS ENTERPRISES, INC., | : | |
| *trading as* DAVIS ACURA, | : | |
| Defendant | : | NO. 02-9521 |

**O R D E R**

**AND NOW**, this ___th day of March, 2009, upon consideration of post-trial motions

filed by both parties and responses thereto, and following oral argument on July 7, 2008, **IT IS**

**ORDERED** that:

1. Defendant's Motion for Judgment as a Matter of Law Or, In the Alternative, For a
   New Trial and Motion to Alter or Amend the Verdict (Docket No.136) is
   **GRANTED** in part and **DENIED** in part.  To the extent Defendant moves for
   judgment as a matter of law, Defendant's Motion is **DENIED**.  To the extent
   Defendant moves for a new trial, Defendant's Motion is **DENIED**.  To the extent
   Defendant moves to alter or amend the verdict, Defendant's Motion is
   **GRANTED**.  Accordingly, the jury's award will be reduced to $119,500.

2. Plaintiff's Motion to Mold the Verdict/Amend the Judgment So As To Increase
   the Lost Wages Component of the Back Pay Award to the Full Amount Required
   by Law and/or As Established by the Properly Admitted Evidence at Trial (Docket
   No. 134) is **DENIED**.

3. Plaintiff's Motion to Alter/Mold the Judgment/Verdict to Include an Appropriate

65

Amount to Compensate Plaintiff for the Negative Federal Income Tax
Consequence of the Verdict/Judgment for Back Pay (Docket No. 133) is
**DENIED**.

4.      Plaintiff's Motion to Alter/Mold the Judgment/Verdict to Include an Award of
Prejudgment Interest on Back Pay and in Re Post-Judgment Interest (Docket No.
135) is **GRANTED**.  Plaintiff Mr. Argue shall provide a prejudgment interest
calculation that takes into account the reduction of his award to $119,500 using
Treasury bill rates.  Post-Judgment interest shall be awarded in accordance with
28 U.S.C. § 1961 from the date of entry of judgment against Defendant.

5.      Plaintiff's Petition for Attorney's Fees and Costs (Docket No. 146) is **GRANTED**
in part and **DENIED** in part.  Plaintiff is awarded $250,486.59 in attorney's fees
and $16,787.85 in costs.

6.      Defendant's Motion to Stay Execution of Judgment (Docket No. 147) is deemed
**MOOT**.

7.      Judgment is entered against Defendant Davis Acura in the amount of $119,500,
plus prejudgment interest, post-judgment interest, attorney's fees in the amount of
$250,486.59, and costs in the amount of $16,787.85.

8.      The Clerk shall mark this case **CLOSED** for all purposes, including statistics.


                         BY THE COURT:



                         S/Gene E.K. Pratter
                         GENE E.K. PRATTER
                         United States District Judge